[Civ. No. 37246. First Dist., Div. One. Sept. 17, 1975.]

RUNNING FENCE CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF SONOMA COUNTY, Respondent;
COMMITTEE TO STOP THE RUNNING FENCE et al., Real Parties
in Interest.

**COUNSEL**

Spridgen, Barrett, Achor, Luckhardt, Anderson & James, Edwin C. Anderson, Jr., John O'Brien, Paul Kayfetz, Howard, Prim, Rice,

Nemerovski, Canady & Pollak, Howard N. Nemerovski, Jerome B. Falk, Jr., Stephen M. Tennis and Fred H. Altshuler for Petitioner.

No appearance for Respondent.

Thomas A. Haeuser for Real Parties in Interest.

**OPINION**

**SIMS, J.**—By petition filed with this court petitioner, the successful applicant for a use permit to construct "the Christo Running Fence, a specialty Fence Art Project" and to display it for a period of 14 days, seeks a writ to restrain the respondent court from taking any further proceedings in an action brought by real parties in interest in which the respondent court orally ordered the issuance of a peremptory writ of mandate directing the board of supervisors to set aside resolutions it adopted in connection with the denial of an appeal from the grant of such permit, and directing the board not to issue such use permit, or any other permit for the project, until after the preparation, review and approval of an environmental impact report in accordance with procedures prescribed by law and applicable regulations. The Sonoma County Environmental Protection Committee,[1] the county board of zoning adjustments and the board of supervisors had all determined that the project was one which would not have a significant effect on the environment. (See Pub. Resources Code, §§ 21151 and 21152, subd. (a), and discussion part IV below.) The substantive issue is whether that action was proper. The procedural issues are whether the respondent court acted in excess of its jurisdiction in granting relief to the real parties in interest on the record before it. Preliminarily, petitioner is confronted with the question of whether it should be relegated to its right to appeal.

---

[1]Section 21082 of the Public Resources Code directs: "All public agencies shall adopt by ordinance, resolution, rule or regulation, objectives, criteria and procedures for the evaluation of projects and the preparation of environmental impact reports pursuant to this division. . . ."

Section 15050 of the guidelines adopted pursuant to the CEQA provides in subdivision (a): "Each public agency is responsible for complying with CEQA and these Guidelines. Each public agency must develop its own procedures consistent with these Guidelines." (Cal. Admin. Code, tit. 14, § 15050.)

On April 3, 1973, the Sonoma County Board of Supervisors adopted Ordinance No. 1628, adding chapter 23A to the Sonoma County Code. It sets up procedures to carry out the foregoing mandate. Under section 23A-37 of the ordinance the preliminary

For reasons discussed below it is determined that the substantive issues are properly before this court, and that on the record before it, the trial court erred in setting aside the resolutions of the board of supervisors and in ordering that the preparation of an environmental impact report was a condition precedent to the issuance of the use permit. The relief requested by petition must be granted.

I

Following the full course of the administrative proceedings which were provided under local ordinance (see fn. 1 above), the real parties in interest sought judicial review. Since a hearing was required under the local ordinance *(id.)* the proper procedure, as has been recognized by the parties, was an action in accordance with the provisions of section 1094.5 of the Code of Civil Procedure.[2] In their petition for writ of mandamus the protestants attacked the action of the board of supervisors in adopting a negative declaration, and in issuing the use permit, on the basis of that declaration, without an environmental impact report, on the following grounds: "7. Respondent's action in adopting the Negative

evaluation of projects, including use permits (§ 23A-3 (ii)(4)), is committed to the environmental protection committee created by the ordinance (§ 23A-3 (e)). The committee's authority is defined as follows: "The Committee shall determine, in accordance with the standards delineated in the Act, the Guidelines, this ordinance, and resolution, whether or not a private project which would ordinarily be expected to have a significant effect on the environment will have no significant effect on the environment due to circumstances peculiar to the specific private project. In the event that the Committee determines that a private project which would ordinarily be expected to have a significant effect on the environment will have no significant effect on the environment, then the Committee shall direct the Planning Director to prepare a Negative Declaration. In the event that the Committee determines that the private project may have a significant effect on the environment, then the Committee shall notify the Planning Director that an environmental impact report is required." (§ 23A-38.)

In the case of a use permit, review of the committee's evaluation is made by the board of zoning adjustments (§§ 23A-35(a)(3) and 23A-48) at a public meeting in connection with review of the merits of the use permit (§§ 23A-41 and 23A-42). If the committee has directed a negative declaration provisions are made for special notice of the hearing (§§ 23A-43, 23A-44, 23A-45, 23A-46). Final review is with the board of supervisors if they are the agency to hear appeals from the action taken (§ 23A-56).

[2]Section 21168 of the Public Resources Code provides as follows; "Any action or proceeding to attack, review, set aside, void or annul a determination or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure."

Section 21168.5 provides for other situations, and is applicable where no factual hearing is required, such as action of a local agency in adopting an ordinance. (See *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74, fn. 3 [118 Cal.Rptr. 34, 529 P.2d 66], and accompanying text.)

Declaration and in determining that no environmental impact report was required constituted prejudicial abuse of discretion in that respondent failed to proceed in the manner required by law, . . .";[3] [¶] "8. Respondent's decision that there may not be any significant environmental effect, and to adopt the Negative Declaration, is not supported by the findings contained in the resolution, . . .";[4] and paragraph 9 which sets forth five particulars in which it is alleged that the board's resolution to adopt a negative declaration is not supported by substantial evidence.[5]

The real party in interest, petitioner herein, and the board of supervisors each filed answers in which they denied the material charges of the petition, and set up as affirmative defenses the failure of the protestants to state a cause of action, the protestants' lack of standing to bring the action, the failure of protestants to exhaust their administrative remedies, the failure of protestants to produce the administrative record, and laches because of the delay of protestants in filing the action (see fn. 9 below). Real party in interest also filed declarations executed by one of its attorneys and by a member of the staff of the Sonoma County Planning Commission, which set forth in considerable detail, with

---

[3]The following specific grounds are advanced in paragraph 7 of this petition: "(a) The Negative Declaration does not conform to the requirements of Cal. Admin. Code, Title 14, sections 15033 and 15083(b) that it include a statement of the reasons to support the findings: [¶] (b) The Negative Declaration does not conform to the requirements of Cal. Admin. Code, title 14, section 15083(b) that it include a statement indicating who prepared the initial study; [¶] (c) The Negative Declaration is defective and void because no initial study was conducted as required by Cal. Admin. Code, Title 14, Sections 15029.5, 15080, and 15081; [¶] (d) The Negative Declaration is defective and void because the County of Sonoma has not adopted 'objectives, criteria and procedures for the evaluation of projects and the preparation of environmental impact reports' as required by Pub. Res. Code section 21082, allowing a Negative Declaration to be adopted by the subjective whim of all county agencies and [¶] (e) An environmental impact report was not required as specified under Cal. Admin. Code, Title 14, Section 15081(a), despite the existence of widespread controversy and a large body who feel that the effect is adverse."

[4]The particulars of the charge are set forth as follows: "(a) The findings are phrased in terms of the language of the legislation, eg. Finding No. 1, 'substantially restored'; Finding No. 2, 'prevent significant environmental damage'; and the general finding, that the project 'will have no substantial adverse impact on the environment'; [¶] (b) the findings are that the adverse effects will be mitigated, not that there will be no substantial adverse environmental effect, to wit: [¶] (1) Finding No. 2 is that the construction procedures are 'designed' to prevent damage, not that there will be no significant damage; and [¶] (2) Finding No. 3 is that the impact will be 'mitigated', not that there will be no significant damage; [¶] (c) There are no findings concerning several possible adverse effects that were raised at the hearing, eg. erosion, the degrading effect on the human surroundings due to visual pollution and overcrowding, the traffic overburden on the roads, fire and police control, and the movements of wildlife."

[5]The petitioner failed to furnish the trial court with a copy of the administrative record, and at the hearing they dropped their attack on the sufficiency of the evidence.

exhibits, the procedures which had been followed and investigations that had been conducted in connection with the adoption of the negative declaration and the issuance of the use permit.

The protestants filed replications denying the allegations of the affirmative defenses asserted by respondent board and the permittee. They also filed a declaration of the chairperson of protestant The Committee to Stop the Running Fence, in which she stated it was an incorporated association formed February 27, 1975, because of mutual concern about the effect of the project on the environment and that she had attended the hearing before the board which was conducted on the appeal of her husband, who himself is a member of the committee. She also alleged that there were editorials, numerous articles and letters to the editor, expressing views both in favor of and opposed to the construction of the fence, and she attached copies of many to her declaration.

The matter came on for hearing June 17, 1975, on the alternative writ issued by the court. The court denied the protestants' motion for a continuance, and a motion to dismiss interposed by the permittee in interest. Over the objections of the respondent board and the permittee the chairperson of the protesting committee was permitted to testify concerning the nature of the committee; her presence at the hearing before the board of supervisors; concerns voiced about excessive traffic, that the fence would contribute to crowds, the obstacle that the fence would create to wildlife, sight pollution, and the number of holes that would be dug. She verified that the individual co-protestant in the administrative mandamus action had appeared and spoken against the petition. She testified concerning the newspaper coverage of the project. She explained the delay in filing suit on the basis of her belief that nothing could be done until the permittee secured approval from other agencies and because the resolution of the board of supervisors was not readily available. She elaborated on her interest in the fence by reference to her residence in close proximity to where it was planned, and her opinion that the construction and exhibition of the fence would compound her existing traffic problem. Cross-examination indicated that the witness did not live as close to the fence site as she said; and that there was considerable evidence before the board of supervisors, including a letter from the California Highway Patrol captain, that he had no objection from a traffic viewpoint consideration if (as is provided in the use permit) the fence panels could be removed immediately on request of the California Highway Patrol if necessary to maintain safe

traffic movement. Other testimony referred to the preponderance of letters in favor of the project and the approval of the landowners directly concerned. No further testimony was adduced and the matter was continued for two days to permit the protestants to file the declarations which have been referred to above.

At the continued hearing, June 19, 1975, the protestants' attempts to introduce in evidence minutes of the supervisor's meeting and copies of the letters addressed to the board in connection with that meeting, failed because the documents were not authenticated. The matter was submitted on the pleadings, points and authorities submitted by each side, the two declarations, including the exhibits attached thereto, filed on behalf of the permittee (with the exception of one paragraph), the declarations of the chairperson of the protesting committee together with newspaper clippings (received over the persistent objections of the permittee), the declaration of the attorney for the protestants (over objections, in part sustained), and the testimony received at the first hearing. Following oral argument the court continued the matter until later in the day for decision.

At the afternoon session the court announced its decision as follows: "I've concluded that I must rule in favor of the petition, in support of the petition, and accordingly, I order the issuance of a pre-emptory [sic] writ of mandate directed to the respondent and directing the respondent to set aside its resolution No. 48447 and its resolution No. 48448, and further directing the respondent not to issue to the real party in interest a use permit *and directing every agency of the County of Sonoma not to issue any permit* for the project described in the petition until after the preparation, review and approval of an environmental impact report in accordance with the procedures required by the California Environmental Quality Act and the guidelines for implementation of that Act published in the California Administrative Code." (Emphasized portion added in subsequent discussion by the court.) The court's findings as then announced are discussed below. When one of the permittee's attorney asked if the court wished findings of fact and conclusions of law prepared, the judge replied that he did, and inquired whether the permittee requested the same. (See Code Civ. Proc., § 632; Cal. Rules of Court, rule 232.) The attorney and his co-counsel then answered that they did, and the attorney subsequently stated that he had no objection to preparing the findings. The record is uncertain as to whether the judge's pronouncement was merely an anouncement of intended decision, a judgment (to be effective if findings were not requested, or, if

requested, waived), or a preliminary injunction.[6] It is clear, however, that the trial court intended all activity in connection with the construction of the project to cease as of that date. The court then denied the protestants' motion for costs because they had not incurred the expense of producing an administrative record. It also denied the permittee's request that the protestants file a bond if construction under the permit was to be stayed.

A few days after the court announced its decision and order the permittee withdrew its request for findings. The protestants apparently then requested findings. On August 21, 1974, in response to the alternative writ of mandate issued in these proceedings, the protestants filed an answer containing a copy of findings of fact and conclusions of law signed by the trial judge on August 6, 1975, and filed August 11, 1975. The effect of these findings on the substantive merits of the case is discussed below. (See part V below.) They do not affect the question of the right of the petitioner herein to seek review of the June 19, 1975 order of the court by the petition for writ of prohibition and/or mandate which it promptly filed eight days after the order complained of was pronounced.

## II

■ "Section 1086 of the Code of Civil Procedure provides that the writ of mandate 'must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law.'* ["*Section 1103 of the Code of Civil Procedure contains a similar provision with respect to the writ of prohibition."] Although the statute does not expressly forbid the issuance of the writ if another adequate remedy exists, it has long been established as a general rule that the writ will not be issued if another such remedy was available to the petitioner. [Citations.] The burden, of course, is on the petitioner to show that he

---

[6]The record discloses: "MR. TENNIS (Permittee's Attorney): Does the Court intend to have the Order portion prepared in writ form? I thought I heard you. THE COURT: I simply wanted the Reporter to type it up so the Clerk can get it exactly as announced, but, no, I had not intended for the Court to prepare a formal Order and I think that ought to wait until after the adoption of the findings and the conclusions. MR. TENNIS: Very Well. THE COURT: However, I guess we're in kind of—I have made an Order and it is effective forthwith, so I would expect that the respondents at least would comply with the prohibition part of that Order."

After further discussion the court reiterated, "I think the Order that I have announced is exactly what I intended to do and also complies with subparagraph (e) of 1094.5, in other words, I've ordered the Board to vacate their administrative order or decision and I further order that they may not issue the use permit without requiring the E.I.R., so whether they want to reconsider it or how they do it is up to them, but they may not issue a use permit without an E.I.R."

did not have such a remedy. [¶] An appeal is the usual course open to a litigant who believes that the trial court has committed error." (*Phelan* v. *Superior Court* (1950) 35 Cal.2d 363, 366 [217 P.2d 951].)

In this case an appeal would lie from any judgment entered pursuant to the minute order of the trial court, and presumably from the minute order itself, insofar as it constituted an injunction effective pending the entry of judgment. (See *Carroll* v. *Civil Service Commission* (1970) 11 Cal.App.3d 727, 733 [90 Cal.Rptr. 128]; Code Civ. Proc., § 1094.5, subd. (f), and § 904.1, subds. (a) and (f).)

"Where an order is not appealable, but is reviewable only upon appeal from a subsequent judgment, various factors, such as expense of proceeding with a trial and prejudice resulting from delay, may operate to make that remedy inadequate. Where, however, as here, there is a right to an immediate review by appeal, that remedy is almost as speedy as a writ proceeding, under present practice, and should be considered adequate unless petitioner can show some special reason why it is rendered inadequate by the particular circumstances of his case. [Citation.]" (*Phelan* v. *Superior Court, supra,* 35 Cal.2d 363, 370. See also *Harden* v. *Superior Court* (1955) 44 Cal.2d 630, 634 [284 P.2d 9]; and *Rescue Army* v. *Municipal Court* (1946) 28 Cal.2d 460, 466-467 [171 P.2d 8].)

In *Rescue Army* v. *Municipal Court, supra,* the court pointed out, "The fact that the remedies of trial and appeal were considered adequate in some cases and not in others does not mean that the application for the writ was arbitrarily granted in one and refused in another or that the decisions cannot be reconciled on principle. It is difficult, if not impossible, to lay down a hard and fast rule which will govern all situations, and it must be determined in each case, not only on the basis of precedent but from an examination of all the facts, whether there is an adequate remedy in the ordinary course of law. A reviewing court, in order to prevent a failure of justice, has discretion in accordance with established legal principles and practice, to determine the circumstances which justify the use of prohibition to restrain a lower tribunal from acting without or in excess of its jurisdiction." (28 Cal.2d at pp. 466-467. See also *Harden* v. *Superior Court, supra,* 44 Cal.2d 630, 634; *Hill* v. *Superior Court* (1940) 16 Cal.2d 527, 529 [106 P.2d 876]; *Redevelopment Agency* v. *Superior Court* (1970) 13 Cal.App.3d 561, 565, fn. 5 [91 Cal.Rptr. 886]; *LaMar* v. *Superior Court* (1948) 87 Cal.App.2d 126, 131-132 [196 P.2d 98]; and *Elberta Oil Co.* v. *Superior Court* (1925) 74 Cal.App. 114, 121-122 [239 P. 415].)

In *Rescue Army* the court upheld the use of the writ to award multiplicity of void proceedings. (28 Cal.2d at p. 467.) It also observed, "A remedy is not inadequate merely because more time would be consumed by pursuing it through the ordinary course of law than would be required in the use of the extraordinary writ of prohibition. [Citations.]" (*Id.,* at p. 466.) Similarly in *Jollie* v. *Superior Court* (1951) 38 Cal.2d 52 [237 P.2d 641], the opinion brands as an insufficient ground for the issuance of a writ of prohibition, the assertion that an appeal is an inadequate remedy because it would entail a large expenditure of time and money (38 Cal.2d at p. 56). It is clear that mandate may not be used to supply a substitute for an appeal which the petitioner failed to perfect in a timely manner. (*Phelan* v. *Superior Court, supra,* 35 Cal.2d 363, 370; and *Andrews* v. *Police Court* (1943) 21 Cal.2d 479, 480-481 [133 P.2d 398, 145 A.L.R. 1042].)

On the other hand, in *Harden, supra,* the court intervened to stop an allegedly invalid condemnation action because it appeared that a building under construction on the land the subject of the proceedings would "suffer destruction from the elements, thieves and/or vandals" while the action was pending, and the property owner would be put to further expense in providing support to partially erected walls (44 Cal.2d at p. 635). In *Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550 [219 P.2d 457], the court granted an alternative writ of prohibition to review the action of the superior court in entertaining actions for mandate and an injunction to check a housing project because it appeared that delay would result in a loss of federal financing (35 Cal.2d at p. 556). It is said that a writ of prohibition "is allowed in exceptional cases where there is also a remedy by appeal if the circumstances are aggravated and justify immediate relief. [Citation.]" (*Hill* v. *Superior Court, supra,* 16 Cal.2d 527, 529.) There the court added, "In the present case it is alleged that the release of the attachment would render worthless any judgment secured by the plaintiff, and the circumstances which are pleaded in detail justify the procedure which has been invoked." (*Id.,* pp. 529-530. See also *Golden State Glass Corp.* v. *Superior Ct.* (1939) 13 Cal.2d 384, 389 [90 P.2d 75]; *Root* v. *Superior Court* (1962) 209 Cal.App.2d 242, 245 [25 Cal.Rptr. 784]; and *Weintraub* v. *Superior Court* (1928) 91 Cal.App. 763, 768 [267 P. 733].) So a writ of prohibition has been used to review the term of an injunction granted against striking workers. (See *United Farm Workers etc. Committee* v. *Superior Court* (1967) 254 Cal.App.2d 768, 769 [62 Cal.Rptr. 567].) There the court observed, "That the petitioners herein had no 'plain, speedy and adequate remedy at law' as alleged, seems apparent in this modern age

when timely action is requisite for the protection of constitutional rights; the petitioners have in fact filed an appeal from the preliminary injunction as issued, but the perfection of a record, the consideration of legal claims, and the necessary time consumed in any formal appeal make it apparent that before correction of this basic error could be secured through the appellate device the strike might well be either won or lost." *(Id.)* In *San Francisco* v. *Superior Court* (1928) 94 Cal.App. 318 [271 P. 121], the court sought and was granted extraordinary relief against the invalid increase of a jury's condemnation award because it would have to pay the increased award before an appeal could be perfected and heard (94 Cal.App. at p. 321). The use of a writ of prohibition to review a temporary injunction restraining the action of the petitioner as director and officer of the corporation has been approved on a showing that considerable sums had been invested in drilling oil wells, and that the leases under their terms might be lost if work ceased. (See *Elberta Oil Co.* v. *Superior Court, supra,* 74 Cal.App. 114, 123.)

The application for the use permit describes the "Running Fence" as a major modern art project consisting of an 18-foot high heavy white nylon fabric fence hung from a steel cable strung between steel poles, generally 62 feet apart, for a distance of 24 miles from United States Highway 101 near Cotati, westerly through Sonoma and Marin Counties to the Pacific Ocean at Estero San Antonio. Construction is contemplated as a two-phase operation. The first phase consisting of installation of the relatively inconspicuous structural parts—poles, guys, anchors and upper cable—was estimated to take five months. The second phase, the unfurling and tie-down of a cable on the lower edge of the fabric to prefabricated anchors, approximately 18 to 24 feet apart, over the entire 24 miles, was contemplated for one day. Permission was requested to display the "Running Fence" for 14 days, and then remove all evidences of its presence from the land.

The use permit as issued contemplates that the properties over which the fence will run will be restored to their original condition prior to November 1, 1975, and it expires by its terms on that date. It limits the display period to a period of 14 days commencing with the erection of the first fabric panel.

In preparation for the project the petitioner secured 40-foot easements from over 53 property owners in Sonoma County. According to the declaration filed in support of the petition filed with this court, a majority of the easements expire on or before November 1, 1975, and further

expense would be necessitated to renegotiate for easements in the event of delay.

That declaration also reflects that weather conditions dictate the display and removal of the fence prior to November 1, before the rainy season sets in; that almost $1.4 million has been expended on the project; and that delay will cause expense for storage of materials procured for the construction of the fence; that there are interrelated permits for the fence which might have to be renegotiated with numerous governmental entities if the project is delayed; that arrangements for necessary liability insurance and performance bonds will also be affected; that preparation of the report ordered by the trial court will cause extensive delay and expense; and that during all of the delay petitioner will be faced with liability for salaries and other expenses of remaining in business.

In view of the above facts we have no hesitancy in concluding that there was no abuse of discretion by this court in issuing an alternative writ to grant the petitioner review on the showing made in support of its petition, rather than relegating it to the further delays attendant to the settlement of findings, entry of judgment and a subsequent appeal. Extraordinary circumstances were presented and were not controverted.

Because of the time consumed in securing a return and hearing on the argument on the matter it now appears that it may be physically impossible to execute the project before the rainy season sets in. The protestants contend that we should discharge the alternative writ and relegate the permittee to its remedy by appeal. We reject this contention because the factual and legal issues have all been disclosed and argued before this court.

Even if the facts now adduced in response to the alternative writ of mandate might indicate that the writ was erroneously issued because of the existence of an adequate remedy by appeal, we are not constrained from considering the merits of the issues raised. In *Hagan* v. *Superior Court* (1960) 53 Cal.2d 498 [2 Cal.Rptr. 288, 348 P.2d 896], the court analyzed a similar situation as follows: "Real parties in interest contend that the remedy by appeal is adequate. Petitioners could request, and if necessary compel, respondent court to enter a judgment dismissing their complaint in intervention for failure to comply with its security order. [Citations.] An appeal could then be taken from such dismissal challenging the propriety of the security order. Such an appeal, however, would raise a question that has already been fully presented and considered at length in this proceeding, and no purpose but delay, to the prejudice of

the parties and the courts, would be served by refusing to decide the jurisdictional question at this time. [Citations.]" (53 Cal.2d at pp. 501-502. See also *City & County of S.F.* v. *Superior Court* (1959) 53 Cal.2d 236, 243-245 [1 Cal.Rptr. 158, 347 P.2d 294]; *City of Los Angeles* v. *Superior Court.* (1959) 51 Cal.2d 423, 429 [333 P.2d 745]; *Golden State Glass Corp.* v. *Superior Ct., supra,* 13 Cal.2d 384, 389; and *Castaneda* v. *Municipal Court* (1972) 25 Cal.App.3d 588, 592 [102 Cal.Rptr. 230].)

The protestants' objections to the entertainment of the issues raised by the permittee's petition are overruled.

### III

The principles to be applied in this case have been expounded in *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, where the court observed, "This appeal, the first case arising under the California Environmental Quality Act (hereafter CEQA) (Pub. Resources Code, § 21050 et seq.) to reach this court since *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 . . ., compels us to inquire into how an agency should decide whether a pending project requires an EIR." (13 Cal.3d at p. 73, fn. omitted.) The court continued, "In CEQA, the Legislature sought to protect the environment by the establishment of administrative procedures drafted to 'Ensure that the long-term protection of the environment shall be the guiding criterion in public decisions.' (Pub. Resources Code, § 21001, subd. (d).) To achieve these objectives, CEQA and the guidelines issued by the State Resources Agency to implement CEQA establish a three-tiered structure. If a project falls within a category exempt by administrative regulation (see Pub. Resources Code, §§ 21084, 21085), or 'it can be seen with certainty that the activity in question will not have a significant effect on the environment' (Cal. Admin. Code, tit. 14, § 15060), no further agency evaluation is required. If there is a possibility that the project may have a significant effect, the agency undertakes an initial threshold study (Cal. Admin. Code, tit. 14, § 15080); if that study demonstrates that the project 'will not have a significant effect,' the agency may so declare in a brief Negative Declaration. (Cal. Admin. Code, tit. 14, § 15083.) If the project is one 'which may have a significant effect on the environment,' an EIR is required. (Pub. Resources Code, §§ 21100, 21151; see Cal. Admin. Code, tit. 14, § 15080.)" (*Id.,* p. 74. See also Flow Chart, Cal. Admin. Code, tit. 14, p. 319.)

This case falls within the second category and is governed by the provisions of sections 15080-15083 of the Guidelines for Implementation

of the California Environmental Quality Act of 1970. (Cal. Admin. Code, tit. 14, §§ 15080-15083.)[7] In *Friends of Mammoth* v. *Board of Supervisors*

[7]These rules as revised up to February 1, 1975, provide as follows:

"15080. If a project is not exempted by these Guidelines from the requirements of CEQA, the Lead Agency should conduct an initial study to determine if the project may have a significant effect on the environment. If any of the effects of a project may have a substantial adverse impact on the environment, regardless of whether the overall effect of the project is adverse or beneficial, then an environmental impact report must be prepared where discretionary governmental action is involved. [¶] If the project is to be carried out by a nongovernmental person, the Lead Agency may require such person to submit data and information which will enable the agency to make this determination."*

*Although these sections were not effective in the above form until April 1, 1975, the changes in text so effected do not materially affect the issues in this case.

"15081. (a) The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data. An iron clad definition of significant effect is not possible because the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area. There may be a difference of opinion on whether a particular effect should be considered adverse or beneficial, but where there is, or anticipated to be, a substantial body of opinion that considers or will consider the effect to be adverse, the lead agency should prepare an EIR to explore the environmental effects involved.

"(b) In evaluating the significance of the environmental effect of a project, the Lead Agency shall consider both primary or direct and secondary or indirect consequences. Primary consequences are immediately related to the project (the construction of a new treatment plant may facilitate population growth in a particular area), while secondary consequences are related more to primary consequences than to the project itself (an impact upon the resource base, including land, air, water and energy use of the area in question may result from the population growth).

"(c) Some examples of consequences which may have a significant effect on the environment in connection with most projects where they occur, include a change that: [¶] (1) Is in conflict with environmental plans and goals that have been adopted by the community where the project is to be located; [¶] (2) Has a substantial and demonstrable negative aesthetic effect; [¶] (3) Substantially affects a rare or endangered species of animal or plant, or habitat of such a species; [¶] (4) Causes substantial interference with the movement of any resident or migratory fish or wildlife species; [¶] (5) Breaches any published national, state, or local standards relating to solid waste or litter control; [¶] (6) Results in a substantial detrimental effect on air or water quality, or on ambient noise levels for adjoining areas; [¶] (7) Involves the possibility of contaminating a public water supply system or adversely affecting ground water; [¶] (8) Could cause substantial flooding, erosion or siltation; [¶] (9) Could expose people or structures to major geologic hazards."

"15082. In every case where any of the following conditions are found to exist as a result of a project, the project shall be found to have impacts with a significant effect on the environment: [¶] (a) Impacts which have the potential to degrade the quality of the environment or curtail the range of the environment. [¶] (b) Impacts which achieve short-term, to the disadvantage of long-term, environmental goals. A short-term impact on the environment is one which occurs in a relatively brief, definitive period of time while long-term impacts will endure well into the future. [¶] (c) Impacts for a project which are individually limited, but cumulatively considerable. A project may affect two or more separate resources where the impact on each resource is relatively small. If the effect of the total of those impacts on the environment is significant, an EIR must be prepared. This mandatory finding of significance does not apply to two or more separate projects where the impact of each is insignificant. [¶] (d) The environmental effects of a

(1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], the court pointed out the general criteria to be applied in determining whether an environmental impact report (EIR) is required by the provisions of section 21151 of the Public Resources Code because the project[8] "may have a significant effect on the environment." The court stated, "Two general observations, nevertheless, may be made at this time. On the one hand, in view of the clearly expressed legislative intent to preserve and enhance the quality of the environment (§§ 21000, 21001), the courts will not countenance abuse of the 'significant effect' qualification as a subterfuge to excuse the making of impact reports otherwise required by the act. In this connection we stress that the Legislature has mandated an environmental impact report not only when a proposed project *will* have a significant environmental effect, but also when it 'may' (§§ 21101, 21150, 21151) or 'could' (§§ 21100, 21102) have such an effect. On the other hand, common sense tells us that the majority of private projects for which a government permit or similar entitlement is necessary are minor in scope—e.g., relating only to the construction, improvement, or

project will cause substantial adverse effects on human beings, either directly or indirectly."

"15083. (a) A Negative Declaration shall be prepared for a project which could potentially have a significant effect on the environment, but which the Lead Agency finds on the basis of an Initial Study will not have a significant effect on the environment. Before completing a Negative Declaration, the Lead Agency shall consult with all responsible agencies pursuant to Section 15066.

"(b) A Negative Declaration must include a brief description of the project as proposed, a finding that the project will not have a significant effect on the environment, a brief statement of reasons to support the findings, and a statement indicating who prepared the initial study and where a copy of it may be obtained. The Negative Declaration should normally not exceed one page in length.

"(c) The Negative Declaration shall be made available to the public with sufficient time before the project is approved to provide an opportunity for members of the public to respond to the finding.

"(d) After making a decision to carry out or approve the project, the Lead Agency shall file a Notice of Determination with a copy of the Negative Declaration attached. The Notice of Determination shall include the decision of the agency to approve or disapprove the project, the determination of the agency whether the project will have a significant effect on the environment, and a statement that no EIR has been prepared pursuant to the provisions of CEQA. [¶] (1) If the Lead Agency is a state agency, the Notice of Determination shall be filed with the Secretary for Resources. [¶] (2) If the Lead Agency is a local agency, the Notice of Determination shall be filed with the county clerk of the county or counties in which the project will be located. If the project requires discretionary approvals from a state agency, the Notice of Determination also shall be filed with the Secretary for Resources."*

*Although these sections were not effective in the above form until April 1, 1975, the changes in text so effected do not materially affect the issues in this case.

[8]"Project" includes "[a]ctivities involving the issuance to a person of a . . . permit . . . or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065, subd. (c). See also Cal. Admin. Code, tit. 14, § 15037, subd. (a)(3).) It concededly includes the granting of a use permit under the local agency's zoning ordinance.

operation of an individual dwelling or small business—and hence, in the absence of unusual circumstances, have little or no effect on the public environment. Such projects, accordingly, may be approved exactly as before the enactment of the EQA." (8 Cal.3d at pp. 271-272. See also *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 83-84, and fn. 17.)

In *No Oil,* the court found that the trial court prescribed and the city council followed an erroneous test in deciding that the project—the enactment of ordinances establishing oil drilling districts which would permit a petroleum company to sink two test oil wells in a newly zoned district—did not require an EIR. The court ruled that the test—" 'there is a reasonable possibility that the project will have a momentous or important effect of a permanent or long enduring nature' "—set far too high a barrier to the preparation of an EIR (13 Cal.3d at p. 82). The court observed, "We do not think this court at this time should draft a substitute test. The responsibility for formulation of such a test is expressly delegated by CEQA to the State Resources Agency." (13 Cal.3d at p. 82, fn. 15.) It took note of section 15040 of the guidelines which provides, "Significant effect means a substantial adverse impact on the environment." (Cal. Admin. Code, tit. 14, § 15040.) It concluded that under the circumstances "we believe it would be inappropriate for us to utilize the present case to determine the validity of section 15040, or to preempt the Resources Agency by drafting an alternative definition. Our conclusion that the trial court's definition is patently erroneous is sufficient to decide the present appeal." (*Id.,* pp. 82-83, fn. 15.)

Nevertheless the opinion proceeds to elaborate on the general language found in the first paragraph, as quoted above from *Friends of Mammoth,* as follows. The court found no statutory warrant for restricting the requirement of an EIR to projects of permanent or long enduring nature. It stated, ". . . although the duration of an environmental effect is one of many facts which affect its significance, nothing in the act suggests that short-term effects cannot be of such significance as to require an EIR." (*Id.,* p. 85.)

It pointed out that there was a factual dispute concerning the probability that the project might cause landslides or blowouts, and approved the following language from *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 814 [108 Cal.Rptr. 377]: "The very uncertainty created by the conflicting assertions made by the parties as to the environmental effect . . . underscores the necessity of the EIR to substitute some degree of factual certainty for tentative opinion and speculation." *(Id.)*

It appears to equate the following statements, "an agency should prepare an EIR whenever it perceives *'some substantial evidence* that the project "may have a significant effect" environmentally' " [*County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d at p. 809, italics added herein]; and "an environmental impact report should be prepared 'whenever the action *arguably* will have an adverse environmental impact.' (Italics in original.)" (*Id.,* fn. omitted.) In like tenor the opinion states, "Furthermore, the existence of serious public controversy concerning the environmental effect of a project in itself indicates that preparation of an EIR is desirable." (*Id.,* pp. 85-86, fn. omitted.)

The decision concludes its observations concerning when an EIR should be required with the following observation, "One major purpose of an EIR is to inform other government agencies, and the public generally, of the environmental impact of a proposed project [citations], and to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action. A simple resolution or Negative Declaration, stating that the project will have no significant environmental effect, cannot serve this function." (13 Cal.3d at p. 86.)

In evaluating the foregoing pronouncements it must be borne in mind that CEQA contemplates that a local agency may determine that a project will not have a significant effect on the environment (§ 21152, subd. (a)), and provides a limitation period for commencing an action or proceeding alleging, as here, that the agency has improperly made that determination. (§ 21167, subd. (b).)[9] The statute expressly directs the

[9]Public Resources Code section 21167 provides in pertinent part: "Any action or proceeding to attack, review, set aside, void, or annul the following acts or decisions of a public agency on the grounds of noncompliance with this division shall be commenced as follows: . . . [¶] (b) Any action or proceeding alleging that a public agency has improperly determined whether a project may have a significant effect on the environment shall be commenced within 30 days after the filing of the notice required by subdivision (a) of Section 21108 or subdivision (a) of Section 21152."

Section 21152 provides in part: "(a) Whenever a local agency approves or determines to carry out a project which is subject to the provisions of this division, it shall file notice of such approval or such determination with the county clerk of the county, or counties, in which the project will be located. Such notice shall indicate the determination of the local agency whether the project will, or will not, have a significant effect on the environment and shall indicate whether an environmental impact report has been prepared pursuant to the provisions of this division. . . ."

In this case the board of supervisors on March 18, 1975, passed a resolution adopting a negative declaration (see guideline § 15083, fn. 7 above) (Res. No. 48447), and a resolution denying the appeal of a protestant and approving the action of the board of zoning adjustments in granting a use permit to the petitioner (Res. No. 48448). The action was not filed until May 28, 1975. Petitioner concedes, however, that due to a

state Office of Planning and Research to prepare and develop proposed guidelines for the implementation of CEQA to be certified and adopted by the secretary of the resources agency.[10] We therefore conclude that we should test the action of the board of supervisors by the criteria set forth in sections 15040 and 15080-15083 (see fn. 1 above). Every project which has an effect on the environment is not necessarily one for which an EIR must be prepared. It is established that a negative declaration will be sustained unless as a matter of law it appears that the project as a whole will have a substantial adverse impact on the environment. (See *Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712, 724-726 [117 Cal.Rptr. 96]; and *Hixon* v. *County of Los Angeles* (1974) 38 Cal.App.3d 370, 379-382 [113 Cal.Rptr. 433].)

## IV

In his oral pronouncement the trial judge several times reiterated that the preparation, analysis and approval of an EIR was required as a matter of law. He therefore concluded that action of the board of supervisors in approving the issuance of a use permit was in excess of its jurisdiction, and was a prejudicial abuse of its discretion because it failed to proceed in the manner required by law. (See Pub. Resources Code, § 21168; and Code Civ. Proc., § 1094.5, subd. (b).)

In support of the premise upon which the two foregoing findings must be predicated the judge stated, "I further find that the adoption by the Board of Supervisors of a negative declaration with respect to this project and the adoption or ratification of that negative declaration by the environmental protection committee and the Board of Zoning Adjustments of the County of Sonoma were as a matter of law unsupported by substantial evidence, . . ." Code of Civil Procedure section 1094.5 provides that there is a prejudicial abuse of discretion if the findings are not supported by the evidence. (See *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113

clerical error there was a delay in filing the notice required by section 21152, subdivision (a), until April 29, 1975, so that the action was commenced within the statutory period. They did, however, plead and assert laches.

[10]Section 21083 provides in pertinent part: "Such guidelines shall specifically include criteria for public agencies to follow in determining whether or not a proposed project may have a 'significant effect on the environment'. Such criteria shall require a finding of 'significant effect on the environment' if any of the following conditions exist: [¶] (a) A proposed project has the potential to degrade the quality of the environment, curtail the range of the environment, or to achieve short-term, to the disadvantage of long-term, environmental goals; [¶] (b) The possible effects of a project are individually limited but cumulatively considerable; [¶] (c) The environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly."

Cal.Rptr. 836, 522 P.2d 12].) Public Resources Code section 21168 cautions, ". . . the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record." (See also Code Civ. Proc., § 1094.5, subd. (c).) Since it is established that hearings were held before the board of zoning appeals and the board of supervisors, the lack of a record of those proceedings (see fn. 5 above) precluded the trial court from attempting to review the sufficiency of the evidence. (See *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 690 [104 Cal.Rptr. 110]; *Feist* v. *Rowe* (1970) 3 Cal.App.3d 404, 422 [83 Cal.Rptr. 465]; *Ward* v. *County of Riverside* (1969) 273 Cal.App.2d 353, 358 [78 Cal.Rptr. 46]; *Gong* v. *City of Fremont* (1967) 250 Cal.App.2d 568, 571 and 574 [58 Cal.Rptr. 664]; and *Ames* v. *City of Pasadena* (1959) 167 Cal.App.2d 510, 513 [334 P.2d 653] [disapproved on another issue, *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506, 517, fn. 16].)

The trial judge, recognizing the foregoing shortcoming, continued as follows: ". . . with respect to this particular finding, although a question has been raised concerning the submission to this Court of a complete record of the administration proceeding, the record that has been presented in the form of exhibits to the respondent's declarations and the evidence that has been presented in those declarations demonstrates [*sic*] that this project has characteristics as to which it could [*sic* "not"] be determined that there was no substantial evidence of adverse environmental impacts resulting from the project." In explanation the court alluded to the nature of the project itself and concluded, "it is a project which strongly suggests the likelihood . . . of significant and adverse environmental impacts." So much may be conceded. In fact it led to an initial study as required by section 15080 of the guidelines. This study was conducted in accordance with the requirements of Sonoma County Ordinance No. 1628 which implemented the terms of the CEQA, as required by section 21082 of the act and section 15050 of the guidelines. (See fn. 1 above.)

The court pronounced one more finding of fact stating: ". . . with respect to the project under consideration in this case, that is the running fence, there exists some substantial evidence that the project may have a significant adverse effect environmentally." In support of this position the judge turned to the application itself, the staff report of the county environmental protection committee, the conditions attached to the use permit, and the precautions revealed by the declarations filed on behalf of the permittee.

He found in the application recognition that endangered plant species might be present and that there were implications of adverse biological impacts which could be long-term and significant.[11] The environmental protection committee adopted a negative declaration. (See fn. 1 above.) Notice of that action and of hearing before the board of zoning adjustments was regularly given. A staff report recites in part, "ENVIRONMENTAL STATUS: Negative Declaration: the Environmental Protection Committee noted that the temporary nature of the project together with conditions of the Use Permit will mitigate adverse effects." In its analysis the staff reported in part: "The fence will pass through or over a few areas which are sensitive to environmental damage, notably the Estero Americano south of Valley Ford and several small creeks. Staff feels that it is mandatory that a qualified biologist oversee fence placement in these sensitive areas, at applicants expense, and with authorization to reroute the fence or to prohibit construction of sections where significant environmental damage could occur. Most of the fence route is through grazing land which should not sustain significant environmental damage." The board of zoning adjustment after a hearing approved a use permit subject to 18 conditions,[12] and in doing so recited, "the Sonoma County Board of Zoning Adjustments did consider

[11]A two-page exhibit attached to the application entitled "Biological Setting and Effects" does state, "Endangered plant species shown in the Appendix to this section may be present." Attached is page listing 10 species of endangered plants with a high probability of being found in the vicinity of the "Running Fence" and 9 species whose presence would be considered questionable. The report stated, "In general, the effect of the project upon the biota along its route is expected to be minimal. However, there is a possibility of direct construction impact upon several species of endangered plants, where the fence crosses the bed of Americano Creek near Valley Ford. Although *such an impact could be long-term and significant,* it need not be. For example, it has already been determined that construction equipment will not cross the creek but must go around it. Other careful construction practices under the supervision of a trained observer could eliminate the possibility of this impact." (Italics added.) With the foregoing exception, the report shows no significant impact upon flora and fauna, no modification of the channels of streambeds, no significant short or long-term impact on the grasslands of the fence route, no short-term or long-term biological disruption.

[12]So far as is material to these proceedings those conditions are as follows:

"1. That this permit shall expire on November 1, 1975.

"2. [Location]

"3. [Conformance to plans]

"4. That the fence panels shall be constructed of white fabric which is fire retardent to the satisfaction of local fire agencies.

"5. That all costs of public agencies resulting from this project, other than ordinary services associated with the issuance of required permits, shall be borne by the applicant; these costs shall include, but not be limited to, special or emergency police or fire service, and enforcement of the conditions of this permit.

"6. That prior to the issuance of Building Permits, a bond in the minimum amount of $150,000 shall be posted to insure compliance with the conditions of this permit to correct damages and for compensation to any property affected by this project or to the

and adopt the negative declaration regarding this project, . . ." Following the appeal by the husband of the chairperson of the committee protestant, the board of supervisors, after a public hearing, itself adopted a negative declaration,[13] and a second resolution granting the use permit.

County of Sonoma or other public agencies; said bond shall be acceptable to the County Counsel.

"7. [Liability insurance]

"8. That a qualified biologist shall be retained by the County at applicant's expense, to oversee construction and removal of the project to insure that the project will be constructed in a manner which mitigates adverse impact on wildlife, plant life, riparian zones and marshes; the Planning Director may, prior to issuance of Building Permits, require a cash deposit in an amount sufficient to reimburse the County for anticipated costs of the biologist's services.

"9. [Encroachment permits]

"10. That the project shall not cause or contribute to blockage of any public or private rights-of-way except as may be allowed by written authorization of the affected owners or agencies.

"11. [County permits]

"12. That all other applicable permits (local, State and Federal) shall be obtained and resultant conditions met and copies of said permits shall be placed on file with the Sonoma County Planning Department prior to the issuance of County Building Permits.

"13. That fabric fence panels shall not be erected or displayed without written authorization of the Planning Director; and that prior to issuance of said authorization, the applicant shall consult with the following agencies for the safe conduct of the display period: California Highway Patrol, California Division of Forestry, Pennigrove Fire Protection District, County Public Health Department, County Sheriffs Department, Cotati Fire Protection District, California Department of Fish & Game.

"14. That the display period of the project shall be limited to a period of fourteen (14) days commencing with the erection of the first fabric panel; and that at the end of said display period, the applicant shall immediately commence removal of the project and restoration of affected properties substantially to their original condition, including removal of roadside litter; and in any case, said removal and restoration shall be completed prior to the expiration of this permit.

"15. That the fabric fence panels shall be removed immediately upon request of the California Highway Patrol, if necessary to maintain safe traffic movement.

"16. That at least 80 persons trained in crowd and traffic control, fire prevention, and citizen and property rights shall be stationed along the project route during the fabric display period.

"17. That the portion of the project route within 1000 feet of U. S. 101 Freeway, and the portion within Estero Americano shall be constructed last and removed first following the display period.

"18. That this permit shall be subject to revocation or modification by the Board of Zoning Adjustments if: (a) the Board finds that there has been noncompliance with any of the foregoing conditions or (b) the Board finds that the use for which this permit is hereby granted is so exercised as to be substantially detrimental to persons or property in the neighborhood of the use."

[13]The resolution recites the finding of negative declarations by the Sonoma County Environmental Protection Committee and the Sonoma County Board of Zoning Adjustments, and sets forth the brief description of the project and the fact that a public hearing was held on the appeal. It continues: "WHEREAS, the Board finds: 1. that the use is a temporary project and that affected properties will be substantially restored to their original condition prior to November 1, 1975; [¶] 2. that project construction vehicles will use wide flotation tires, a special hole-punching machine will be used for

The judge's oral pronouncement seized upon the emphasized language from the biological report attached to the application. (See fn. 11 above.) He noted that the staff report alluded to the same problem, and that the use permit itself indicated that an environmental problem existed. He summarized his views as follows: "I take that view that question of how to provide for avoidance or amelioration of adverse economic impact is not a matter to be decided by staff on the basis of a negative declaration but it is a matter to be decided after the submission of an environmental impact report, the exposure of the problems to the public and to the administrative agency and to other interested agencies. The submission of proposed relief in the form of controls or conditions and the public deliberation on whether those proposed controls and relief measures will adequately avoid, mitigate or ameliorate the adverse environmental impacts."

At first blush, the trial court's analysis may appear logical. The Legislature has required a report shall be prepared before approval of any project "which may have a signifiiant effect on the environment." (Pub. Resources Code, § 21151.) The state guidelines define "significant effect" as "a substantial adverse impact on the environment." (Cal. Admin. Code, tit. 14, § 15040.) It is therefore a quick jump to conclude that in any case in which the record, however incomplete, discloses substantial evidence of a possible adverse impact on the environment an EIR must be proposed. On analysis, however, such a conclusion disregards the legislative mandate in several particulars. In the first place the Legislature has recognized that there are projects which may or may not have a significant effect on the environment (see §§ 21152, subd. (a) and 21167, subd. (b)); and the guidelines have provided in detail the procedure to be followed in determining whether an EIR is required. (Cal. Admin. Code, tit. 14, §§ 15080-15084.) Secondly, the responsibility for making such a determination is entrusted to the public agency involved. (§ 15030; Pub. Resources Code, § 21152; and Cal. Admin. Code, tit. 14.) Court review is limited in scope. (Pub. Resources Code, §§ 21168 and 21168.5.) Finally, it should be noted that the determination of the effect or impact on the environment relates to the project in the

---

fence pole placement, and other construction procedures are designed to prevent significant environmental damage; [¶] 3. that a qualified biologist will be retained by the applicant to oversee construction and removal of the project so that the project will be constructed in a manner which will mitigate adverse impact on wildlife, plant life, riparian zones and marshes; [¶] and therefore, that the project as described above will have no substantial adverse impact on the environment, now [¶] THEREFORE BE IT RESOLVED, that the Board of Supervisors adopts the Negative Declaration regarding this project."

form in which it is applied for and approved, not as it might otherwise have been constructed or conducted.

The test here as we have seen is whether there is any substantial evidence in the light of the whole record to sustain the decision of the local agency. It is obvious that in the absence of a record of the evidence before the board of zoning adjustments and the board of supervisors neither the trial court nor this court can say as a matter of law that the effected properties will *not* be substantially restored to their original condition upon completion of the project, that construction procedures are *not* designed to prevent significant environmental damage, or that overseeing by a qualified biologist will *not* mitigate adverse impact on wildlife, plant life, riparian zones and marshes. (Cf. fn. 13 above.)

It is true that the phrase "mitigate adverse impact" as used in the finding of the board of supervisors, and similar language in condition 8 of the conditions of the use permit (see fn. 12 above), give rise to an implication that there may be some adverse impact remaining. Nevertheless, in the absence of any evidence to show that the impact on the environment will not be mitigated, or any evidence to show that the effects remaining after such mitigation will have *a substantial* adverse impact on the environment, the conclusion of the local agency that the project as permitted will have no substantial adverse impact on the environment is unassailable. The very report which formed the predicate for further study, and which was the basis of the finding of the trial court, points out that there need not be any long-term or significant impact on endangered plants, and that careful construction practices could eliminate the possibility of this impact.

The only other environmental hazards suggested by the material referred to by the court were traffic and crowd control, and possible fire hazard. These matters were all adequately covered by the conditions attached to the project as approved and are governed by the principles discussed above.

The protestants suggest that this case is governed by *No Oil, Inc.* v. *City of Los Angeles, supra.* They suggest that the court there laid down the rule that if there is any substantial evidence showing a substantial adverse environmental effect, then the court should require an EIR. There is some language in the dicta in *No Oil* which indicates that an agency should prepare an EIR whenever it perceives some substantial evidence that the project may have a significant effect environmentally.

(13 Cal.3d at p. 85, and see p. 417 above.) A literal application of this test would reduce the three-tiered test, apparently approved in *No Oil* (*id.,* at p. 74, and see p. 413 above), to a two-tiered test, and render invalid the procedures set forth in the guidelines for adopting a negative declaration. If there is no certainty that the project will not have a significant effect on the environment (Cal. Admin. Code, tit. 14, § 15060), and there is a possibility that a project may have such effect (*id.,* § 15080), there must be some substantial evidence to suggest that possibility. Under the rule proposed an EIR would then be required. *No Oil* recognizes that in a proper case a negative declaration may be adopted. We reject the inference that the existence of factual controversy, uncertainty, conflicting assertions, argument, or public controversy[14] can of themselves nullify the adoption of a negative declaration and require the preparation of an EIR when there is no substantial evidence in the record that the project as designed and approved will fall within the requirements of the act.

In *No Oil* the court noted that short-term effects may have such significance as to require an EIR (13 Cal.3d at p. 85). There is here, however, no such evidence. It may be noted that among the categorial exemptions, promulgated as authorized by law (Pub. Resources Code, § 21084) in the guidelines, are "Minor temporary uses of land having negligible or no permanent effects on the environment, including carnivals, sales of Christmas trees,. etc." (Cal. Admin. Code, tit. 14, § 15104, subd. (e).) There is no substantial evidence here that the project will have other than a negligible and temporary effect on the environment.

The proceedings must still be examined in the light of the guidelines found in sections 15081-15083. (See fn. 7 above.) The legal issues raised by the protestants' case and the court's opinion may be better analyzed in connection with the findings of fact and conclusions of law subsequently filed by the court.

## V

As noted above since these proceedings were commenced the court has signed and filed findings of fact and conclusions of law. In *Bruce* v.

[14]Any evidence going to the merits of the controversy, as distinguished from that directed to meeting the permittee's affirmative defenses of capacity to sue, and exhaustion of administrative remedies and laches, was improperly admitted by the trial court over the objection of the permittee and the board of supervisors. We, therefore, do not attempt to extract the wheat of environmental protest from the chaff of aesthetic displeasure in the voluminous clippings presented by the protestants.

*Gregory* (1967) 65 Cal.2d 666 [56 Cal.Rptr. 265, 423 P.2d 193], the court adverted to the following principles, "It has been held that a judge hearing a mandamus proceeding may properly consider, in deciding whether to issue a peremptory writ, all relevant evidence, including facts not existing until after the petition for writ of mandate was filed. This is so because mandamus is an action where equitable principles apply [citations], and because issuance of the writ is frequently a matter for the court's discretion [citations]." (65 Cal.2d at pp. 670-671.) Protestants contend that this court should therefore take notice of the entry of the findings of fact and conclusions of law and deny the peremptory writ because the proceedings are moot. (See *Coyne* v. *Superior Court* (1947) 80 Cal.App.2d 898, 901 [183 P.2d 36, 706]; and *Campbell* v. *Superior Court* (1932) 126 Cal.App. 652, 653 [14 P.2d 925].) Here, however, as in *Bruce* v. *Gregory, supra,* the controversy is not rendered moot by the entry of the findings of fact and conclusions of law. If the court was proceeding in excess of its jurisdiction petitioner is still entitled to the relief he sought. In *City and County of S.F.* v. *Superior Court, supra,* the court observed, "Moreover, although 'the remedy by writ of prohibition is a preventative, rather than a corrective remedy [citations] . . . "the operation of the writ of prohibition is excluded only in cases when the action of the inferior tribunal is completed, and nothing remains to be done in pursuance of its void order. If its action is not completed and ended, its further proceedings may be stayed, and if it is necessary for the purpose of affording complete and adequate relief, what has been done will be undone." [Citations.]' (*Evans* v. *Superior Court* (1939) 14 Cal.2d 563, 580 . . . .) Consequently the fact that the superior court has issued a temporary restraining order and has made its minute order that mandate issue (although its peremptory writ has not issued) certainly does not exclude prohibition here." (53 Cal.2d at pp. 244-245.) We, therefore, examine the findings of fact and conclusions of law to determine whether they preclude issuance of the peremptory writ, or should themselves be vacated and set aside.

The findings of fact purport to dispose of the second and fifth affirmative defenses asserted by the permittee and by the board of supervisors by reference to the protestants' opposition and concern with the effect of the project upon the environment of Sonoma County (findings 1 and 2), and by a categorical statement that any delay from March 18, 1975, to May 28, 1975, in filing the petition has not been unreasonable and has not caused any prejudice to the permittee (finding 21). Since the permittee has not pursued these and other affirmative defenses, except the failure to file an administrative record, we may pass on to other issues.

After setting forth the nature and capacity of the board of supervisors, of the permittee, and of the Sonoma County Environmental Protection Committee (findings 3, 4 and 5), the findings relate the proceedings taken from the filing of the application for the use permit in November 1974 to the adoption of the resolution encompassing the negative declaration by the board of supervisors in March 1975 (findings 6 through 11). Insofar as these findings suggest factual and legal discrepancies in the proceedings they may be analyzed in connection with those findings which make a direct frontal attack on the sufficiency of the proceedings.

The action of the Sonoma County Environmental Committee is attacked as follows: "Neither the action of the COMMITTEE on December 3, 1974, finding and determining that the project would have no substantial adverse impact on the environment, nor the preparation and posting of the 'Notice of Negative Declaration and Public Hearing' was preceded by an initial study, as defined by §§ 15029.5 and 15080 and the determination made by the COMMITTEE that the project would have no substantial adverse impact on the environment was a determination made in disregard of the considerations enumerated in §§ 15081 and 15082." (Finding 14 and see finding 7.) Section 15029.5 defines "initial study" as "a preliminary analysis prepared by the . . . agency pursuant to Section 15080 to determine whether an EIR or a Negative Declaration must be prepared." Section 15080 mandates the preparation of an initial study under the circumstances presented in this case. (See fn. 7 above.)

The court found and the record indicates that on December 3, 1974, the committee, without having required the preparation of an initial study and acting upon the personal knowledge of the members of the committee of the environmental characteristics of the site and its surroundings and the environmental effects of the project, found and determined that the project would have no substantial adverse impact on the environment, and directed the preparation of a "Notice of Negative Declaration and Public Hearing" by the secretary of the board of zoning adjustments (finding 7). Such notice was in fact posted (finding 8). The conclusion that this action was insufficient is erroneous in that examination of the implementation ordinance (Ord. No. 1628, §§ 23-35-23A-49) indicates that the committee's action is merely a preliminary step in the adoption of a negative declaration in cases where a public hearing is required on a private project. Therefore the failure of the committee to have a full report before it did not invalidate the subsequent action of the board of zoning adjustments.

Conversely, if we have erred in our interpretation of the county ordinance, the fact that the board of zoning adjustments adopted a negative declaration with an initial study before it, after public notice and hearing is sufficient to cure any earlier errors or omissions in procedure.

The court found that the staff report, prepared by the Sonoma County Planning Commission, which was before the board of zoning adjustments at the public hearing substantially conformed to the requirements of the guidelines found in sections 15080 and 15081 (findings 9 and 15). It also found that after the public hearing and consideration of the recommendation of the committee, that board adopted the negative declaration (finding 10). No procedural defects were found in the action of the board of zoning adjustments, as distinguished from the substantive attacks discussed below (see findings 16, 17 and 20).

The findings further recite the action taken by the board of supervisors on the appeal from the board of zoning adjustments and the action taken by the supervisors (finding 11). Here again it was acknowledged that the determination was preceded by an adequate preliminary report (finding 15), but the action is attacked on a factual basis (findings 16, 17 and 20).

Before considering the factual attack on the action of the committee, the board of zoning adjustments and the board of supervisors attention may be directed to two procedural matters asserted by contestants in their petition below. (See fn. 3 "a" and "b," and accompanying text.) The trial court found, "The negative declaration (Exhibit A to petition herein) does not contain a statement briefly presenting the reasons that the project would not have a significant effect on the environment and therefore does not require an EIR, as required by §§ 15033 and 15083(b)." (Finding 12. See fn. 7 above for text of § 15083, subd. (b).)

As has been noted above, the notice in question is one given under the county ordinance as a preliminary step toward the adoption of the negative declaration. The steps outlined by the ordinance in connection with a private project for which a use permit is to be issued after a public hearing are as follows: a decision by the planning director that the project is not one exempt from the other provisions of the act, the guidelines, and the ordinance (§ 23A-36), referral to the committee (§ 23A-37), a preliminary determination by the committee (§ 23A-38), a direction to "the Planning Director to prepare a Negative Declaration"

in the event the committee determines the project will have no significant effect on the environment (§ 23A-38), preparation of a negative declaration (§ 23A-43), a public hearing on the negative declaration (§§ 23A-41, 23A-42 and 23A-46) preceded by special notice (§ 23A-44), and posted notice (§ 23A-45), and transmittal of the negative declaration with comments to the planning agency (§ 23A-48), in this case the board of zoning adjustments, for hearing with the application for the use permit. "The Planning Agency shall consider the Legislative Declaration and comment(s), if any, and either adopt or reject the Negative Declaration prior to deciding to approve or disapprove the private project." (§ 23A-48, part.)

From the foregoing it is clear that the "Notice of Negative Declaration and Public Hearing," which is the instrument referred to in the court's finding, is just one step in the final adoption of negative declaration by the "Planning Agency" to which the local agency (the county) has delegated the authority to adopt such a declaration. The notice further recites, "Additional details of this project, copies of the Initial Study and/or records of the proceedings of the Environmental Protection Committee, together with any written comments, are on file and available for inspection at the Sonoma County Planning Department, 2555 Mendocino Avenue, Santa Rosa, California 95401." Reference to the planning department would have revealed all of the details of the project, as set forth in the application, the committee's report which stresses the temporary nature of the structure, the applicant's guaranty to leave the property as it found it, and that crowd control and cleanup would be covered by conditions in the use permit and a bond. Reference to the planning director's staff report affirms that the temporary nature of the project and the conditions of the use permit will mitigate adverse effects. Moreover, in the absence of a record produced by the protestants it cannot be determined whether or not there were other instruments on file. At the time the board of zoning adjustments approved the negative declarations there were ample reasons of record.

The court also found "The negative declaration does not contain a statement indicating who prepared the initial study leading to the negative declaration, as required by § 15083(b)." (Finding 13. See fn. 7 above for text of § 15083, subd. (b).) Here again reference to the planning commission's office would give all pertinent details to any interested member of the public. It was clear at the time of the adoption of the resolution that the board of zoning adjustments was relying on the information in the application, the report of the committee, the staff

report of the planning director, and such comments, unrecorded in these proceedings, as may have been made at the public hearing.

In the absence of a showing that the foregoing technical deficiencies, if such they were, were voiced at either the hearing before the board of zoning adjustments or at the hearing before the board of supervisors, they cannot be raised for the first time on seeking court review. Any omission was not only nonprejudicial but also correctable. (See Gov. Code, § 65801;[15] *Mack* v. *Ironside* (1973) 35 Cal.App.3d 127, 130-131 [110 Cal.Rptr. 557]; and *Ward* v. *County of Riverside, supra,* 273 Cal.App.2d 353, 356-357.) Moreover, the final negative declaration of the board of supervisors did set forth its reasons. (See fn. 13 above.) The two findings referred to above do not support the signed conclusions of law, which themselves embody the court's oral pronouncement.

The core of the findings on which the court's order must rest is subject to the same defect as its oral pronouncement. The court eviscerates the right of the local agency to determine that although a project could potentially have a significant effect on the environment, it will not in fact do so. The court refers to the staff report of the planning commission, which has been reviewed in part IV above, and found that "it demonstrated the existence of the following conditions as a result of the project: [setting forth the language found in subdivisions (a), (b) and (c) of section 15082]." (Finding 9. See fn. 7 above for text of § 15082.) The court substituted its judgment for that of the board of zoning adjustments and that of the board of supervisors which after hearings, which are unreported for the court proceedings under review, found that the project as planned and limited would not result in the conditions referred to in the guidelines.

---

[15]Government Code section 65801 provides: "Formal rules of evidence or procedure which must be followed in court shall not be applied in zoning matters, except to the extent that a county or city may provide therefor. No action, inaction or recommendation regarding any zoning matter by any legislative body or any administrative body or official of any county or city shall be held void or invalid or be set aside by any court on the ground of the improper admission or rejection of evidence or by reason of any error, irregularity, informality, neglect or omission (hereinafter called 'error') as to any matter pertaining to petitions, applications, notices, findings, records, hearings, reports, recommendations, appeals or any matters of procedure whatever, including, but not limited to, those included in this section, unless after an examination of the entire case, including the evidence, the court shall be of the opinion that the error complained of was prejudicial, and that by reason of such error the party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error had not occurred or existed. There shall be no presumption that error is prejudicial or that injury was done if error is shown."

The court refers to 11 conditions found in the use permit (conditions 4, 5, 6, 8, 10, 13, 14, 15, 16, 17 and 18, see fn. 12 above), as "aimed at avoiding, ameliorating, mitigating or compensating for adverse environmental effects expected to result from the construction of the project." (Finding 10.)

The court also sets forth the details of the construction of the project to show its magnitude, sets forth the statements reviewed above in part IV which gave rise to the control of construction by a qualified biologist, includes extracts from the staff report, and lists the conditions of the use permit referred to above (finding 16). After marshalling these facts, and without any record of the proceedings before the administrative agencies, the court further finds, "The uncontradicted evidence upon which the COMMITTEE, BZA, and the BOARD acted in taking their respective actions described in the foregoing Findings of Fact, demonstrated conclusively that: [setting forth again the language found in subdivisions (a), (b) and (c) of section 10582]." (Finding 18.)

As mixed findings of fact and conclusions of law it is further found that the action of the committee (finding 14), the board of zoning adjustments and the board of supervisors (finding 15) were all taken in disregard of the considerations described in sections 15081 and 15082 of the guidelines. (See also finding 20.)

The conclusions of law echo the original pronouncement of the court that the actions of the administrative agencies were invalid because of a failure to prepare an environmental impact report which the court deemed required as a matter of law. Significantly the court, despite the absence of a record of the proceedings, concluded that there was a prejudicial abuse of discretion by the administrative bodies because "the findings and determinations of said bodies that the project would have no substantial adverse environmental impact are not supported by substantial evidence." The conclusions further direct the issuance of a writ of mandate embodying terms substantially identical with those originally pronounced.

We are not unmindful of the warnings in *Mammoth* and *No Oil* that a negative declaration may not be used to avoid the preparation of an environmental impact report. On the other hand, where the applicant has tailored his project and is willing to accept conditions which the appropriate agency finds will render the project such that it will not have a substantial adverse effect on the environment, his admissions and

concessions should not be turned against him to further delay the project in the absence of evidence that the project *as designed and projected and approved* will have a substantial adverse affect as a matter of law. One may ask, Is an environmental impact report necessary to determine that a project other than as planned and approved would be detrimental?

It may be noted that section 15083 requires the agency to consult with all responsible agencies pursuant to section 15066.[16] The record reflects that the staff of the Marin County Planning Commission recommended the adoption of a negative declaration, a tideland permit and design review approval subject to conditions; that the planning commissioner approved the negative declaration, but failed to grant the permit or approval by a tie vote. The Marin County Board of Supervisors granted the permit and approval on the applicant's appeal. The California State Land Commission adopted a negative declaration and granted the applicants six-month lease on tidal lands. The North Central Coast Regional Commission approved the project. The United States Engineers adopted a negative declaration under the National Environmental Policy Act. Intracounty consultation was undertaken by the environmental protection committee.

The record appears to show meticulous consideration to the procedures and issues of substance raised by the act and the guidelines. It is, therefore, apparent that the court abused its discretion and exceeded its jurisdiction in proceeding as it did on June 19, 1975, and that the subsequent findings of fact and conclusions of law suffer from the same infirmity. ■ "In passing on the questions arising out of the E.Q.A. it is the duty of the court to consider the legal sufficiency of the steps taken by the local agency in determining whether or not any proposed action may have subsequent effects on the environment. It is not the duty of the court to determine the validity of the conclusions reached [citations]." (*Plan for Arcadia, Inc.* v. *City Council of Arcadia, supra,* 42 Cal.App.3d 712, 725-726.)

■ Petitioner's attack on the jurisdiction of the trial court in seeking a writ of prohibition is governed by the following principles: "A writ of

---

[16]Section 15066 reads, "When more than one public agency shall be involved in undertaking or approving a project, the Lead Agency shall consult with all responsible agencies (i.e., all the other public agencies involved in carrying out or approving the project) before completing a draft EIR or Negative Declaration. This early consultation is designed to insure that the EIR or Negative Declaration will reflect the concerns of all responsible agencies which will issue approvals for the project. After completing the draft EIR or Negative Declaration, the Lead Agency shall also consult with and seek to obtain comments from other public agencies having jurisdiction by law and should consult with persons having special expertise as described in Sections 15083 and 15085."

prohibition is an appropriate remedy to arrest the proceedings of a court when there is not a plain, speedy, and adequate remedy in the ordinary course of the law and when the proceedings of the court are without or in excess of its jurisdiction. (Code Civ. Proc., §§ 1102, 1103.)" (*Hagan* v. *Superior Court, supra,* 53 Cal.2d 498, 501.) In this sense the term "jurisdiction" has the broad meaning ascribed to it in *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280 [109 P.2d 942, 132 A.L.R. 715], where the court, after an extensive review of the concept (17 Cal.2d at pp. 286-291), concluded: "Speaking generally, any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of *stare decisis,* are in excess of jurisdiction, in so far as that term is used to indicate that those acts may be restrained by prohibition or annulled on *certiorari.*" (*Id.* at p. 291. See also *Hagan* v. *Superior Court, supra,* 53 Cal.2d 498, 502; *City & County of S.F.* v. *Superior Court, supra,* 53 Cal.2d 236, 243; *City of Los Angeles* v. *Superior Court, supra,* 51 Cal.2d 423, 429; *Housing Authority* v. *Superior Court, supra,* 35 Cal.2d 550, 556-557; and *Hill* v. *Superior Court* (1940) 16 Cal.2d 527, 529 [106 P.2d 876].)

The facts in this case are strikingly similar to those in *City & County of S.F.* v. *Superior Court, supra.* There, as here, a permit had been authorized for a construction project by the administrative tribunal of last resort of the local agency. The contestants sought a writ of mandate from the superior court commanding that tribunal, which had overruled the order of the city planning commission denying a permit and had ordered that a permit issue for the construction of an apartment house building. There, as here, the superior court had issued its minute order that a writ of mandate issue, and proposed to file a formal written order to that effect (53 Cal.2d at pp. 239 and 242-243). In that case the superior court heard no evidence whatsoever and the matter was determined solely on issues of law from inspection of the pleadings, including the attached exhibits (*id.,* pp. 240 and 242). In this case evidence, discussed above, was taken by the trial court, but more significantly, as was noted and stressed in the earlier case, in neither case was a stenographic nor other record of the hearing before the administrative tribunal presented to the trial court by the contestant who had the burden to do so. (*Id.,* at p. 242.) The court pointed out, "As already stated, the peremptory writ of mandate which the lower court proposes to issue would command the board of permit appeals to set aside its order overruling the planning commission. Section 1085 of the Code of Civil Procedure provides that the writ of mandate 'may be issued . . . to any . . . board, or person, to compel the performance of an act which the law specially enjoins, as a

duty resulting from an office, trust, or station . . .' It will not lie to control discretion within the area lawfully entrusted to an administrative board. [Citations.] If the action of the board of permit appeals in overruling the planning commission in the present case was within its lawful discretion, it follows that the superior court was about to act in excess of its authority and hence beyond its jurisdiction in attempting to control such action by mandate, and that prohibition will lie to test the matter." (*Id.,* at p. 244.) It concluded, "Here, as stated, the board of permit appeals held a full hearing, viewed the site, and made its independent order. Such order, . . . raises the presumption that the existence of the necessary facts, based on the standards as prescribed by the charter and applicable ordinances, interpreted and administered to promote public health, safety, comfort, convenience and general welfare, had been ascertained and found. It follows that the action of the board in overruling the commission may not be successfully attacked on the ground that such standards were lacking. [Citations.]" (*Id.,* at pp. 251-252.)[17] It restrained further proceedings under the petition for writ of mandate except to vacate the temporary restraining order and to deny the prayed for relief.

Let a peremptory writ of prohibition issue restraining the respondent superior court from taking further proceedings in the action entitled Running Fence Corporation, petitioner, vs. Board of Supervisors of the County of Sonoma et al., being action No. 81568 in said superior court, except to vacate its order and decision entered and pronounced on June 19, 1975, and any and all proceedings thereafter taken to formalize said order, and to deny the relief prayed for in the petition filed in said action.

Molinari, P. J., and Elkington, J., concurred.

---

[17]*In Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506, the court laid down the following rules, " . . . we hold that regardless of whether the local ordinance commands that the variance board set forth findings, that body must render findings sufficient both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the board's action. We hold further that a reviewing court, before sustaining the grant of a variance, must scrutinize the record and determine whether substantial evidence supports the administrative agency's findings and whether these findings support the agency's decision. In making these determinations, the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision." (11 Cal.3d at pp. 513-514.) Where there is no administrative record, the last sentence controls, and the rule quoted above in the opinion is still applicable to such findings as have been made.