[Civ. No. 47393. First Dist., Div. Two. Feb. 9, 1981.]

HANS-JOACHIM DEHNE et al., Plaintiffs and Appellants, v.
COUNTY OF SANTA CLARA et al., Defendants and Respondents;
KAISER CEMENT & GYPSUM CORPORATION,
Real Party in Interest and Respondent.

828

830

**COUNSEL**

Ephraim Margolin and Nicolas C. Arguimbau for Plaintiffs and Appellants.

Laurens H. Silver and Fredric P. Sutherland as Amici Curiae on behalf of Plaintiffs and Appellants.

Selby Brown, Jr., County Counsel, and Robert A. Weers, Deputy County Counsel, for Defendants and Respondents.

Thomas P. O'Donnell, Melva M. Vollersen, Ruffo, Beth Arnold, Ferrari & McNeil, Ruffo & McNeil and John R. Hetland for Real Party in Interest and Respondent.

**OPINION**

ROUSE, J.—Plaintiffs, Hans-Joachim Dehne and EIR Permanente, appeal from a judgment in favor of defendant, County of Santa Clara, and the real party in interest, Kaiser Cement & Gypsum Corporation (Kaiser).

Since 1939, Kaiser has owned and operated a cement manufacturing plant and limestone quarry on approximately 1,300 acres of a 3,300-acre tract in the foothills of the Coast Range in Santa Clara County.

In the early 1950's, Kaiser filed plans to add new kilns and equipment with the Santa Clara County Planning Commission, which in turn authorized the additions.

In 1977, in response to the energy crisis and increasingly demanding pollution control standards, Kaiser decided to modernize its facilities. The modernization plans involve a multimillion dollar change in the process Kaiser now uses to manufacture cement. Presently, Kaiser produces cement using the "wet process," in which large amounts of water are added to the raw materials, making them easier to move. Ultimately, the water must be driven off as steam by heat from combustion in rotary kilns before dry cement can result.

The modernization envisioned by Kaiser would produce cement using the "dry process," in which no water is added to the raw materials. This process saves about 500,000 gallons of water a day. Since no water need be evaporated, the process reduces substantially the amount of fuel needed to produce cement, thus reducing the amount of emissions from the plant.

This modernization of the production method entails the replacement of six wet kilns with a single suspension preheater-precalciner kiln. In addition, Kaiser plans to replace tertiary crushing equipment, finish milling equipment, packing and storage load facilities with newer, more modern equipment and facilities.

Many of the existing structures will remain and Kaiser will eventually merge the new buildings with the structures it intends to keep.

Kaiser also plans to modernize its air pollution control equipment and remove the existing tall smokestacks that contain some of its present equipment.

The plans also include adding to the plant an option to burn coal in addition to the natural gas and fuel oil which it now burns.

Kaiser also intends to reposition new structures within the four to six acres occupied by the present plant so as to reduce the visibility of the plant from the surrounding area.

In June 1977, Kaiser initiated discussions concerning its modernization plan with Santa Clara County planning staff's senior planner,

Richard Hall, who is responsible for the environmental processing of private projects. During these discussions, Mr. Hall formed the opinion that the proposed modernization is essentially a replacement of the old facility with a new one. Since the newer facility would produce the same product as before, and the same amount of it, Hall felt that Kaiser's modernization might possibly qualify for a categorical exemption from the California Environmental Quality Act of 1970 (Pub. Resources Code, § 21000 et seq. (CEQA)) under one of the exemption categories contained in the state EIR guidelines for implementation of CEQA (Cal. Admin. Code, tit. 14, ch. 3, § 15000 et seq. (Guidelines)).

In order to investigate this possibility further, Hall requested that Kaiser submit detailed information on the differences between the old plant and the new facilities.

In response to that request, Kaiser submitted a written report. The report confirmed Hall's belief that the project might be exempt under section 15102 of the Guidelines, which exempts replacements or reconstructions of existing structures and facilities.

After receiving the Kaiser report, the county planning staff concluded that the modernization plan was within this exemption category as well as a substantially similar category in the county environmental administrative handbook.

Although the county planning staff is authorized to declare projects categorically exempt, without a hearing, on the concurrence of the planning commission, Hall felt that, given the magnitude of the proposed modernization, the planning commission should make the final decision. Accordingly, Hall sent his recommendation for exemption to the planning commission for consideration at its September 1, 1977, meeting.

At this meeting, the commission considered the planning staff's recommendation and the Kaiser report. It also heard comments by the county planning staff, Kaiser representatives, and members of the public who spoke both for and against the proposed modernization.

At the conclusion of the meeting, the commission unanimously determined that the project was categorically exempt; directed that the proposed plans be referred to the architectural and site approval committee (ASA) for recommendations on new conditions to Kaiser's

use permit; and ruled that the commission would hold a public hearing on the conditions recommended by ASA.

On September 22, 1977, ASA held a public meeting to consider adding, to Kaiser's use permit, conditions which would mitigate certain aspects of the construction and operation of the proposed facility. On the basis of information received from representatives of the City of Cupertino, Kaiser, and the public, ASA prepared written recommendations to the planning commission.

On October 20, 1977, the planning commission held another public hearing to consider the ASA recommendations. That meeting, which was well attended, was continued until November 3, 1977.

On November 3d, the meeting resumed, and Kaiser agreed to all the conditions recommended by ASA. Ultimately, the commission reaffirmed its prior adoption of a categorical exemption, determined that the proposed project was consistent with Kaiser's existing use permit, and adopted ASA's recommended conditions.

Plaintiffs appealed the decision of the planning commission to the Santa Clara County Board of Supervisors (board).

On December 5, 1977, the board heard the appeal at a specially set evening meeting. At that meeting, the board had before it the administrative record from the planning commission and also heard testimony from plaintiff Dehne, his attorney, Kaiser representatives, and members of the public who spoke both for and against the project.

Plaintiffs argued that the grant of a categorical exemption to the Kaiser project was improper because the project involved significant adverse environmental effects. They contended that an environmental impact report (EIR) must be prepared whenever there is any possibility of an adverse environmental effect.

At the conclusion of the meeting, the board unanimously denied the appeal and affirmed the planning commission's grant of exemption. On December 19, 1977, the board adopted a resolution, including findings, formalizing its decision.

In January of the year following, plaintiffs filed a complaint and petition for writ of mandate in the Superior Court of Santa Clara County,

wherein they asked the court to vacate the board's decision and to order the county to comply with CEQA.

The matter was heard by the court in August 1978. At the conclusion of the proceeding, the court granted judgment[1] in favor of defendants and Kaiser. Plaintiffs have appealed from that judgment.

■ Any review of decisions made pursuant to CEQA or the Guidelines is governed by sections 21168 and 21168.5 of the Public Resources Code, the provisions of which focus such review on (1) whether there is any substantial evidence in light of the whole record to support the decision; and (2) whether the agency making the decision abused its discretion by failing to proceed in the manner required by law.

In the trial court, the parties disagreed over which of the two code sections applied.[2] Both sections require the two-pronged inquiry stated above. However, section 21168, which applies to agencies required by law to hold hearings, requires that findings be made by the agency, that the evidence support the findings and that the findings support the ultimate decision. (Code Civ. Proc., § 1094.5, subd. (b); *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12].) On the other hand, section 21168.5 applies to agencies which are not required to hold hearings or make findings. That section requires only that there be substantial evidence to support the ultimate decision. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74-75, fn. 3 [118 Cal.Rptr. 34, 529 P.2d 66].)

---

[1] In the trial court, the parties asked for, and received, a "summary judgment." However, after reviewing this record and listening to counsel's comments at oral argument, it is now clear that the trial court's action was not a "summary judgment motion" within the contemplation of section 437c of the Code of Civil Procedure. It was, instead, merely a characterization of the proceeding wherein the parties agreed that the court need not take new or additional evidence but rather should confine itself to a review of the administrative record which was there under attack. It is apparent, also, that the trial court made a thorough review of that record and then rendered a judgment on the merits, determining that the Santa Clara County Board of Supervisors' decision to uphold Kaiser's categorical exemption was proper and should not be set aside.

[2] In *Myers* v. *Board of Supervisors* (1976) 58 Cal.App.3d 413 [129 Cal.Rptr. 902], the court reviewed the board's decision to grant a categorical exemption under section 21168. In that case, both parties agreed that review by the court was governed by that section. (P. 422.) Here, there is no such agreement, thus the court must determine for itself which is the applicable section.

In this case, the trial court stated that its judgment would have been the same under either section.

■ In determining which section applies, the critical issue to be resolved is whether the board was required by law to hold a hearing on plaintiff's appeal from the planning commission's decision. Plaintiff contends that the board's hearing was required by law, namely, sections 48-2, 50-3, and 51-17, appendix I, of the Santa Clara County Code. We cannot agree.

In our review of these sections, we note that hearings by the board are required on appeals taken from certain types of planning commission and ASA decisions: zoning decisions, ASA permits and use permits, for example. However, it appears that these sections do not apply to a decision to grant a categorical exemption.

After finding the project to be exempt, the planning commission and ASA imposed various conditions upon Kaiser's use permit. An appeal to the board, taken pursuant to one of the above-cited sections, could concern only those conditions which had been imposed on Kaiser's use permit. It would not include a review of the exemption grant. In this case, the conditions imposed on the use permit were never challenged. The transcript of the board's hearing reveals that the only issue before it was the grant of exemption and not the conditional use permit.

Thus, despite the fact that it did so, the board was not required by law to conduct a hearing on plaintiffs' appeal from the planning commission's grant of exemption to Kaiser. For that reason, our review of the court's decision must be limited to the question of whether the requirements of section 21168.5 were satisfied.

It follows, then, that the only questions before us are (1) is the board's decision supported by substantial evidence in light of the whole record; and (2) did the board proceed in the manner required by law? (Pub. Resources Code, § 21168.5.) Plaintiffs' attack on the sufficiency of the board's findings need not be considered.[3]

---

[3]Although we will not scrutinize the findings with respect to whether they support the board's decision, or whether they are supported by substantial evidence, we will consider them to the extent that they may enlighten our inquiry as to whether there is substantial evidence to support the board's ultimate decision.

▮ The issue before the board was the validity of the planning commission's grant of a categorical exemption to Kaiser's modernization project.[4] In its resolution, the board held that the proposed reconstruction will be located on the same site as the existing facility, as is required by the exemption criteria. This holding is supported by substantial evidence. The record before the board and the evidence presented to it establish that: (1) Kaiser's use permit applies to 1,300 acres of property, of which the present plant occupies 6 acres; and (2) the replacement facility will be one-third the size of the existing plant and will be located within that portion of the site bounded by the existing plant.

Plaintiffs contend that the proper interpretation of "same site" in the exemption category is that the new facility must be in precisely the "same physical location" as the old one. They cite no authority in support of this position.

We conclude that a reasonable construction of "same site" does not require such a literal and narrow interpretation as that suggested by plaintiffs. The word "site" is not defined in the Guidelines nor has any court furnished a definition. However, the reasonable scope of "same site" can be inferred from the Guidelines.

Subdivision (b) of section 15102 of the Guidelines permits the replacement of existing structures with ones of "substantially the same size . . . ." This implies that, for the exemption to have internal consistency, "same site" must be construed in a way that includes structures of "substantially" the same size, not precisely or literally the same size, as old structures. Obviously, the site need not be in exactly the same location if the new structure need not be exactly the same size.

Additionally, we note in the record that, although still completely within the actual layout area of the old plant, the location of the proposed plant will have the beneficial result of reducing the visibility of the plant as a whole, with a resulting improvement in the visual aesthetics of the area.

---

[4]The exemption category applied to the project was section 15102 of the Guidelines: "Class 2 consists of replacement or reconstruction of existing structures and facilities where the new structure will be located on the same site as the structure replaced and will have substantially the same purpose and capacity as the structure replaced, including but not limited to: . . . [¶] (b) Replacement of a commercial structure with a new structure of substantially the same size, purpose and capacity."

Plaintiffs contend that only an interpretation such as theirs would allow the Secretary for Resources to find that projects, which are essentially replacements or reconstructions of existing structures, have no significant effect on the environment. They argue that "Allowing project applicants to move the site of facilities even a short distance might have adverse environmental impacts . . . ."

The exemption category does not permit applicants to move the site. Section 15102 of the Guidelines requires that "the new structure will be located on the same site as the structure replaced . . . ." Thus, in this instance, the facility must be reconstructed within the area bounded by the existing plant. In our judgment, such a requirement is sufficient to permit the Secretary for Resources to determine that projects falling within the exemption have no significant environmental effects. This is particularly true in the present case.

Here, the new facilities will remain within the area bounded by the present facilities. For the purposes of the exemption criteria, it is reasonable to regard this area as the "site" of the present facility, since the area is entirely surrounded by the rest of Kaiser's property. That property consists of some 1,300 acres, all of which have been subject to Kaiser's quarrying operations since 1939.

Also, bearing in mind that the ultimate objective in these cases is the protection of the environment, we believe that it is reasonable, in this instance, to construe the term "site" as including the area occupied by the existing plant, since such construction allows Kaiser to position the replacement structures in such a manner as to have the least damaging aesthetic effect on the surrounding environment while still qualifying for exemption.

What about the board's determination that the new facility will have substantially the same purpose as the existing facility, as required by the exemption criteria?

The board found that "The sole purpose of both the present and the proposed modernized plant is to manufacture cement." This finding is supported by uncontradicted evidence, and plaintiffs make no claim to the contrary.

Also, as required by the exemption criteria, the board concluded that the new facility will have substantially the same capacity as the existing

facility. This determination is supported by the finding that "The product capacity of the existing facility is 1,600,000 tons per year; product capacity of the modernized facility will be 1,600,000 tons per year." Here again, this finding is supported by uncontradicted evidence.

Plaintiffs argue that the "purpose" and "capacity" of the new facility will not be "substantially the same" because the new plant will have the capacity to burn coal in addition to natural gas and fuel oil, which it now burns.

The requirement that the project "have substantially the same purpose and capacity" speaks only to the productive purpose and capacity of the old and new plants. It does not demand minute scrutiny of each of the individual components, some of which may incorporate advanced technology into the plant's operations, resulting in the production of the same amount of cement in a more efficient manner.

It appears that coal is not presently utilized at the existing facility. However, it cannot be said that, because of the possible addition of coal as a fuel in its operations, the new plant will have a different purpose or capacity, since coal will be used in making the same end product, viz., cement. Apparently the board regarded this new option in choice of fuel as a modification in the process of making cement rather than one causing the new facility to have a different productive purpose and capacity. Such conclusion was not unreasonable.

Also, plaintiffs argue that approval of the modernization creates a "disincentive for reform to [the use of] the cleaner fuel, natural gas, which Kaiser was using until recently ...."[5]

Evidence presented to the planning commission and to the board indicates that, in accordance with state and federal government plans for energy conservation, the entire industry has converted, or will convert, to the use of coal in its operations, since cement plants will be accorded a low priority in their access to natural gas. Further, that pollutants normally associated with the utilization of coal will be controlled by approved techniques, both in the transportation and in the burning of this

---

[5]This argument suggests an immediate conversion from oil and natural gas as a part of the modernization process. Kaiser's response is summarized in footnote 11 on page 10 of their reply brief: "A decision to burn coal will be deferred until the necessity arises, national energy guidelines are clarified and necessary approvals are obtained from the Bay Area Air Pollution Control District."

type of fuel. It is apparent that the board determined that this possible change in the proposed operation did not affect Kaiser's entitlement to a categorical exemption. Substantial evidence supports such conclusion.

Plaintiffs claim that the capacity of the new plant will not be the same because it will prolong Kaiser's manufacturing operations, a capacity missing from the old plant.

The heart of this complaint is that the new plant will extend the useful economic life of the old facility, thereby prolonging the adverse environmental effects caused by the old plant, which, without modernization, would probably have to close within the near future.

We do not consider the economic life of a facility to be a "purpose" or "capacity" of that facility. Implicit in the statutory exemption for reconstruction and replacement is an understanding that the life of the facilities to be reconstructed or replaced will be extended. To find otherwise would mean that, in order to qualify for exemption, one could replace or reconstruct a facility only if it lasted no longer than the original facility. Such a proposition is patently unreasonable.

Furthermore, section 15101 of the Guidelines exempts from CEQA the "operation, repair, maintenance or minor alteration" of existing structures. Thus, the life of the existing facility could be indefinitely maintained under a different categorical exemption.

Moreover, plaintiffs offered no persuasive evidence in support of their contention that unless the old plant is modernized it would have to close.

Plaintiffs also argue that the old plant's high smokestacks had the purpose and capacity to disperse air pollutants, a capacity missing from the new plant.

Again, we find that a reasonable construction of this requirement does not demand scrutiny of the differences in specific methods of pollution control. Whatever means Kaiser uses to control its emissions, it will have to comply with applicable statutory requirements as well as the regulations promulgated by the agencies charged with the responsibility to monitor and control air emissions.

The record demonstrates that the Bay Area Air Pollution Control District considers the use of "bag houses,"[6] which Kaiser plans to install, to be more efficient than the electrostatic precipitators used in the present plant's stacks, which are already 99 percent efficient. Also, we note that Kaiser is already using bag houses, except for emissions from two kilns, which are serviced by the present stacks. The modernization proposes to install bag houses with respect to those two kilns and then to remove the stacks, resulting in more efficient overall air pollution control and visual improvements to the area.

We conclude that the method of pollution control used in the new facility is not a "purpose" or "capacity" of the new facility within the meaning of the exemption requirement; further, that such requirement cannot be reasonably construed to require that, in order to qualify for exemption, Kaiser must reproduce the tall smokestacks and disperse air emissions as it has been doing for years, thereby foregoing the use of improvements in pollution control technology.

Finally, plaintiffs contend that, even if the exemption criteria seem to be satisfied by the Kaiser project, the scope of the exemption category cannot be deemed to encompass a project of the magnitude envisioned by Kaiser.

We find no support for this contention and, in the absence of any legislative pronouncement on the subject, believe it inappropriate for a court to determine when, if ever, a particular project should be deemed too large to qualify for this categorical exemption.

■ Amicus characterizes section 21084 of the Public Resources Code as permitting the Secretary for Resources to exempt from the CEQA only "relatively minor projects . . . ." We find no basis for, nor do we agree with, this interpretation of the statute. In *Union Oil Co. v. South Coast Regional Com.* (1979) 92 Cal.App.3d 327, 329 [154 Cal.Rptr. 550], the rebuilding and modernizing of an entire dock, damaged by an explosion, was determined to be exempt under section 15102 of the Guidelines.

Amicus presents examples of other exemptions where the category expressly specifies limitations as to the size of the project and argues

---

[6]A bag house is a fiberglass dust collector.

that such limitations imply a general size limitation on all projects and all exemption categories.

We disagree. The more reasonable inference to be drawn from the existence of size limitations in other exempt categories is that where, as here, no such limitation is stated, none was intended to apply. Furthermore, we notice that more than one exemption category specifically allows expansion of existing structures regardless of their original size. (Guidelines, §§ 15102, subd. (a), 15101, subds. (e)(1), (e)(2).)

■ Amicus argues that the exemption category must be narrowly construed and relies upon *Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959 [131 Cal.Rptr. 172]; *Myers* v. *Board of Supervisors* (1976) 58 Cal.App.3d 413 [129 Cal.Rptr. 902]; and *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190 [132 Cal.Rptr. 377, 553 P.2d 537], in support of this argument.

Again, we are unpersuaded. These cases stand for the proposition that exemption categories are not to be expanded or broadened beyond the reasonable scope of their statutory language. (*Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 804-805 [161 Cal.Rptr. 260]; *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 286-287 [152 Cal.Rptr. 585].) Such a construction allows the court to afford the fullest possible protection to the environment within the reasonable scope of the statutory language. (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049]; language cited in: *Wildlife Alive* v. *Chickering, supra,* 18 Cal.3d 190, 198; *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 274 [118 Cal.Rptr. 249, 529 P.2d 1017]; *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 84.)

We conclude that the board carefully considered the requirements of the exemption category; that substantial evidence supports the board's decision; and that, in its review of the case, the trial court properly applied the substantial evidence test.

■ Plaintiffs contend that the board abused its discretion by not proceeding in a manner required by law.

In granting an exemption, the agency must proceed in the manner prescribed by law, lest it be charged with abusing its discretion. (Pub. Resources Code, §§ 21168, 21168.5.) That law consists of CEQA stat-

utes, the Guidelines, and the judicial gloss on both. Only with a considered awareness of the purposes and policy behind this law, and a careful analysis of the proposed project, can an agency apply an exemption to a specific project which appears to meet the exemption criteria.

Obviously, where there is substantial evidence of an adverse impact on the environment surrounding a proposed project, it would be an exaltation of form over substance to grant an exemption because of mere technical compliance with prescribed criteria. We are satisfied, however, that the prescribed procedure for granting such an exemption provides adequate protection against such an improper result and prevents a decision from being made in isolation from the principles underlying CEQA.

In the present case, far from discovering a mechanical application of the exemption criteria, we find a record of scrupulous effort on the part of the planning staff, the planning commission, the ASA, and the board of supervisors to insure a thorough and objective consideration of whether this project should be categorically exempt. Such concern is evidenced in Kaiser's detailed report requested by the planning staff; referral of the matter by the staff to the planning commission, a more representative body; by three public hearings by the planning commission, none of which were required by law; by referral of Kaiser's use permit to the ASA, which held a public hearing on how to minimize the construction phase of the project; and, finally, by a complete review of the matter by the board at a specially set public hearing, again, a hearing which was not required by law. Furthermore, we note that the board did not merely affirm the planning commission's decision, as it was entitled to do, but made specific findings and subfindings, thereby providing the public with a basis for its decision.

Plaintiffs claim that the board abused its discretion and thereby failed to proceed in the manner required by law in that the board used a faulty legal standard, namely, erroneous constructions of the exemption criteria. For reasons set forth in our earlier discussion of those criteria, we find this contention to be without merit.

According to plaintiffs, the fact that substantial evidence supports a finding of no adverse effect on the environment is not enough to warrant an exemption grant if the record also contains substantial unrebutted evidence that an adverse effect would result. In support of this argument, they rely on the following language of *Wildlife Alive* v.

*Chickering, supra,* 18 Cal.3d 190, 206: "[W]here there is any reasonable possibility that a project or activity may have a significant effect on the environment, an exemption would be improper."

This statement must be interpreted in light of more recent developments. After *Wildlife Alive* was decided, the Legislature adopted a controlling definition of "significant effect," viz., "a substantial, or potentially substantial, adverse change in the environment." (Pub. Resources Code, § 21068; see also Guidelines, § 15081, for a similar definition.) Also, it has been held that the reasonable possibility of a significant environmental effect must be supported by a fair argument, based on substantial evidence. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 75; see also Guidelines, § 15084, subd. (b), for a similar requirement.)

Applying such requirements to this case, we cannot disagree with the implication from the planning commission's and the board's decisions that plaintiffs failed to make a sufficient showing that the exemption should not be granted. In the absence of any evidence to show that the impact on the environment will not be mitigated, or any evidence to show that the effects remaining after such mitigation will have a *substantial* adverse impact on the environment, the conclusion of the local agency that the project, as permitted, will have no substantial adverse impact on the environment is unassailable. (*Running Fence Corp.* v. *Superior Court* (1975) 51 Cal.App.3d 400, 423 [124 Cal.Rptr. 339].)

Plaintiffs' assertion appears to suggest that this court should scour the administrative record for substantial, unrebutted evidence of what, in our opinion, constitutes a significant effect on the environment. However, it is not the proper function of this court to independently weigh the evidence. (Pub. Resources Code, §§ 21168, 21168.5; *Gabric* v. *City of Rancho Palos Verdes* (1977) 73 Cal.App.3d 183, 193 [140 Cal.Rptr. 619].) In this instance, such an independent review would be most inappropriate since both the planning commission and the board, as the bodies specifically charged by statute with the responsibility to make environmental decisions, failed to find a significant impact on the environment after providing plaintiffs, on more than one occasion, with adequate opportunities in which to present their arguments.

We note that courts in similar situations have consistently refused to exceed the scope of their authority, on review of administrative decisions, by undertaking independent evaluation of the evidence. Instead,

they have properly limited themselves to application of the substantial evidence test. (See *Pacific Water Conditioning Assn., Inc.* v. *City Council* (1977) 73 Cal.App.3d 546, 558 [140 Cal.Rptr. 812]; *Running Fence Corp.* v. *Superior Court, supra,* 51 Cal.App.3d 400, 422-424; *Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App. 3d 712, 725 [117 Cal.Rptr. 96]; *Hixon* v. *County of Los Angeles* (1974) 38 Cal.App.3d 370, 379-380 [113 Cal.Rptr. 433]. Contra: *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1001-1003 [165 Cal.Rptr. 514].)[7]

Since we have determined that the exemption category as applied to the Kaiser project remains consistent with CEQA, we must uphold the trial court's finding that the categorical exemption section of the Guidelines is a valid and applicable regulation. We reject plaintiffs' suggestion that we should test the validity of the exemption on the basis of an imaginary or speculative set of facts showing how a project might be technically exempt under the category and still involve substantial environmental effects.

In view of our determination of issues raised by plaintiffs, we find it unnecessary to address Kaiser's arguments that the plaintiffs' complaint was barred by the statute of limitations and that the entire modernization was a "ministerial" project and therefore exempt from CEQA.

The judgment is affirmed.

Taylor, P, J., and Miller, J., concurred.

A petition for a rehearing was denied March 11, 1981, and appellants' petition for a hearing by the Supreme Court was denied June 2, 1981. Mosk, J., was of the opinion that the petition should be granted.

---

[7]This case involved not the grant of an exemption, but the issuance of a negative declaration. Although the court found substantial evidence to support the declaration, it also found compelling evidence of potential damage to the environment. Under these circumstances, the court held that a significant adverse change in the environment existed *as a matter of law,* precluding the issuance of the negative declaration.