[No. A085018. First Dist., Div. Four. Sept. 30, 1999.]

PATRICIA ANN FAIRBANK, Plaintiff and Appellant, v.
CITY OF MILL VALLEY et al., Defendants and Respondents;
JACK LEE et al., Real Parties in Interest and Respondents.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.C and II.D.

1244

**COUNSEL**

Stanley & Rose and Laurel S. Stanley for Plaintiff and Appellant.

McDonough, Holland & Allen and Craig Labadie for Defendants and Respondents.

Neil Sorensen; Bien & Summers and Eliott L. Bien for Real Parties in Interest and Respondents.

## OPINION

**SEPULVEDA, J.**—Appellant Patricia Ann Fairbank filed a petition for writ of mandate in the trial court seeking to overturn an approval by respondents, the City of Mill Valley and the Mill Valley City Council, of a commercial building project proposed by real parties in interest, Jack Lee and Christine Lum.[1] The trial court concluded there was substantial evidence for the city's findings that the project is exempt from the requirements of the California Environmental Quality Act, Public Resources Code section 21000 et seq.[2] (CEQA or the Act), and that it complied with the city's general plan and zoning ordinance. Accordingly, the trial court denied Fairbank's petition.

In her appeal, Fairbank argues that the city and trial court misinterpreted the so-called "Class 3" categorical exemption for small commercial structures, which is found in section 15303, subdivision (c), of the Guidelines for Implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines)).[3] Fairbank further contends that there is no substantial evidence to support the city's findings as to the applicability of this CEQA exemption or the project's compliance with the general plan and zoning ordinance.

Respondents counter that case law applying Guidelines section 15303(c) as it read at the time of the trial court's decision,[4] as well as new language

---

[1]As the legal positions of defendants and respondents and real parties in interest and respondents are identical in all material respects, the term "respondents" will hereinafter collectively refer to both groups.

[2]All statutory references are to the Public Resources Code unless otherwise indicated.

[3]For convenience, we will use the shortened form for references to the sections and subdivisions of the Guidelines. For example, we will hereinafter refer to section 15303, subdivision (c) of the Guidelines as Guidelines section 15303(c).

[4]Former Guidelines section 15303(c), which was in effect during the administrative and trial court hearings in this case, provided a categorical exemption for new construction of a variety of small structures, as follows: "Class 3 consists of construction and location of limited numbers of new, small facilities or structures . . . . The numbers of structures described in this section are the maximum allowable on any legal parcel or to be associated with a project within a two-year period. *Examples of this exemption include but are not limited to*: [¶] . . . [¶] (c) Stores, motels, offices, restaurants, and similar small commercial structures not involving the use of significant amounts of hazardous substances, if designed for an occupant load of 30 persons or less, if not constructed in conjunction with the building of two or more such structures. *In urbanized areas, the exemption also applies to commercial buildings on sites zoned for such use, if designed for an occupant load of 30 persons or less if*

adopted after the hearing on Fairbank's petition,[5] support the trial court's interpretation and application of the Class 3 exemption in this case. Respondents further contend that the findings of compliance with the general plan and zoning ordinance are supported by substantial evidence. We agree and, accordingly, will affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Real parties in interest own a one-half city block in downtown Mill Valley on Throckmorton Avenue. In early 1996, they applied for a conditional use permit to allow expansion of an existing restaurant space on the property, which is known as Sonapa Farms. The 1996 application also included a plan to demolish approximately 1,995 square feet of existing building area, expand the parking lot, and convert to office use some 3,978 square feet of existing space located on the second floor of the building, above the businesses known as Banana Republic and Vintage Wine & Spirits. This project was approved by the city's planning commission on June 10, 1996, but was never built.

After concluding that the original proposal was not economically feasible, real parties in interest submitted an application to the city in July 1997, seeking to amend the conditional use permit as follows: (1) to reduce the size of the Sonapa Farms restaurant space from 3,638 square feet to 2,050 square feet; (2) to develop a new 1,828-square-foot restaurant with an 875-square-foot outdoor deck, to be located north of the Corte Madera Creek in a redwood grove; (3) to add a 1,974-square-foot retail building near the location of the proposed project; (4) to refurbish and create a total of 4,880 square feet of second level office space, partially within the existing building above Vintage Wine & Spirits and Banana Republic; and (5) to undertake various site and landscape improvements.

On August 25, 1997, the planning commission approved the restaurant/ office proposal. However, after an appeal to the city council, the application

not constructed in conjunction with the building of four or more such structures and if not involving the use of significant amounts of hazardous substances." (Italics added.)

[5]The current version of Guidelines section 15303(c), which was adopted effective October 28, 1998, provides a categorical exemption for the following: "Class 3 consists of construction and location of limited numbers of new, small facilities or structures . . . . The numbers of structures described in this section are the maximum allowable on any legal parcel. *Examples of this exemption include but are not limited to*: [¶] . . . [¶] A store, motel, office, restaurant or similar structure not involving the use of significant amounts of hazardous substances, and not exceeding 2500 square feet in floor area. *In urbanized areas, the exemption also applies to up to four such commercial buildings not exceeding 10,000 square feet in floor area on sites zoned for such use* if not involving the use of significant amounts of hazardous substances where all necessary public services and facilities are available and the surrounding area is not environmentally sensitive." (Italics added.)

was referred back to the planning commission for consideration of a revised plan to be prepared by real parties in interest, which would respond to issues raised at the city council hearing.

The revised plan, submitted on January 9, 1998, was for only one new building—a freestanding, 2-story, 5,855-square-foot retail/office building—on a portion of an existing parking lot behind the existing commercial buildings that front on Throckmorton. The previous proposal for a creekside restaurant was eliminated, and the redwood grove area was to be retained as visual open space. The revised project did not propose any use of the existing space above the Banana Republic and Vintage Wine & Spirits stores.

On March 9, 1998, the planning commission held a hearing on the revised project. It voted to recommend approval of the design review application and the granting of a floodplain management ordinance variance as requested by real parties in interest. In recommending approval of the project, however, the planning commission sought clarification regarding parking regulations, CEQA review, and creek access issues. The CEQA issue was raised for the first time at the March 9, 1998, planning commission hearing.

The city council voted unanimously to approve the revised project at the conclusion of a public hearing held on April 6, 1998. Prior to approving the project, the council reviewed a 19-page staff report, and a written opinion from the city attorney relating to parking requirements, CEQA compliance, and creek access. In approving the project, the council voted to: "Find that the plans for the proposed commercial building are consistent with all applicable policies in the Mill Valley General Plan and with the criteria in Section 20.66.040 of the Zoning Ordinance in that the design will satisfy the following criteria: [¶] The proposed building will carry out its intended function while resulting in an attractive development which will be in substantial harmony with its locale and surroundings and generally compatible with the size, mass and height of other buildings in the vicinity. [¶] The proposed building will not impair or interfere with the development, use or enjoyment of other property in the vicinity including public lands and rights-of-way. [¶] The materials, colors and architectural character of the proposed building are generally compatible with other structures in the vicinity. [¶] The proposed building and site will be appropriately and adequately landscaped with all existing significant site vegetation being preserved. [¶] Drainage systems and appurtenant structures will have no adverse impacts on other properties. [¶] There will be no cut and fill areas, and there will be very little excavation outside the actual footprint of the

building which will be located on an existing parking lot. [¶] The design and location of the parking area and driveway will meet the intended functional requirements and minimize or avoid adverse effects on natural resources or adjacent properties. [¶] The proposed building is consistent with all applicable Building Intensity Standards and Design Guidelines contained in the Mill Valley General Plan." In addition, the city council imposed 31 conditions on the project, covering matters such as the colors and materials to be used in construction of the buildings, a requirement that no trees be cut down, and restrictions on the use of the buildings.

On April 7, 1998, the city filed a notice of exemption, citing Guidelines sections 15301, 15302(b), 15303(b) and (c), and 15061(b)(3). Fairbank sought judicial review of this decision by filing a petition for writ of mandate in the trial court on May 12, 1998. On July 27, 1998, the city filed a motion to exclude certain items of evidence Fairbank had attached as exhibits to her memorandum of points and authorities in support of her petition. In particular, the city sought exclusion of declarations submitted by an architect, Brian Farnsworth, and by Antero Rivasplata, the Chief of the State Clearinghouse in the Governor's Office of Planning and Research. Those declarants would have testified that "occupant load" is a term of art used in the architectural and engineering fields, one that was defined in the 1994 Uniform Building Code (Cal. Code Regs., tit. 24, former § 1002 et seq. (UBC)), which was in effect when the city approved the project in this case. In addition, Rivasplata would have testified that it has been the position of his office that the term "occupant load," as used in the Guidelines, is a reference to the term used in the UBC. The city's motion was granted by order dated September 4, 1998.

The trial court denied Fairbank's petition after a hearing on September 25, 1998. The court found that: (1) the revised project qualifies for an exemption under Guidelines section 15303(c); (2) Fairbank had failed to carry her burden of producing substantial evidence to show a reasonable possibility of adverse environmental impact sufficient to remove the project from the exempt category; (3) the city had reasonably interpreted its general plan policies in determining that city codes allowed for "grandfathering" of nonconforming parking facilities; and (4) Fairbank was precluded from litigating various issues for failure to raise them in the administrative proceedings. This timely appeal followed.[6]

---

[6]On January 22, 1999, Fairbank filed a petition for writ of supersedeas, No. A085597. We summarily denied that petition on March 12, 1999.

## II. Discussion

### A. *The Revised Project Is Exempt From CEQA Under the Current Version of Section 15303(c).*

Fairbank's principal arguments are that the city and the trial court misinterpreted Guidelines section 15303(c), and that there was no substantial evidence for the city's finding that the Class 3 exemption applies to the project in this case. ■ We agree with Fairbank that the first of these issues is a question of law, subject to de novo review by this court. (*Azusa Land Reclamation Co.* v. *Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1192 [61 Cal.Rptr.2d 447] (*Azusa*).) On the other hand, the substantial evidence test governs our review of the city's factual determination that a project falls within a categorical exemption. (§ 21168; Code Civ. Proc., § 1094.5; see also *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 566-567 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827, 835 [171 Cal.Rptr. 753] (*Dehne*).) ■ After independently reviewing the language and history of Guidelines section 15303(c), and reviewing the record for substantial evidence, we are satisfied that the exemption found in that provision, as amended in 1998, applies to the project in this case.

"The Legislature has made certain categories of projects exempt from CEQA. Many of these exemptions appear in Public Resources Code section 21080, subdivision (b). [Citations.] Public Resources Code section 21080, subdivision (b)(9) exempts from CEQA '[a]ll classes of projects designated pursuant to Section 21084.' [¶] Public Resources Code section 21084 authorizes the Secretary of the Resources Agency to include in the Guidelines a list of classes of projects exempt from CEQA provided that the Secretary makes 'a finding that the listed classes . . . do not have a significant effect on the environment.' The classes of projects identified by the Secretary of the Resources Agency appear in Guideline section 15300 et seq. and are sometimes referred to as 'categorical exemptions.' The Secretary of the Resources Agency's authority to identify classes of projects exempt from CEQA is not unfettered. 'The secretary is empowered to exempt only those activities which do not have a significant effect on the environment. (Pub. Resources Code, § 21084.) It follows that where there is any reasonable possibility that a project or activity may have a significant effect on the environment, an exemption would be improper.' (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 205-206 [132 Cal.Rptr. 377, 553 P.2d 537].) To implement the rule laid out in *Chickering*, Guidelines section 15300.2, subdivision (c) was adopted, which provides: 'Significant Effect. A categorical exemption shall not be used for an activity where there is a reasonable possibility that the

activity will have a significant effect on the environment due to unusual circumstances.' " (*Azusa, supra,* 52 Cal.App.4th at p. 1191.)

Fairbank first contends that the language of the Class 3 exemption, as it existed at the time of the administrative and trial court proceedings, cannot apply to this case because the proposed building was "designed for an occupant load" of more than 30 people. Fairbank further contends that "occupant load" is a term of art used in the architectural and engineering professions, and is defined in the UBC (Cal. Code Regs., tit. 24, § 1003.2.2 et seq. & table 10-A; see also *id.,* former § 1002.1.2 & former table 10-A). Applying the UBC standard to the present project, moreover, Fairbank claims the occupant load of the proposed 5,855-square-foot building—with 3,130 square feet of office space and 2,725 square feet of retail space— would be 122 persons.[7]

Respondents point out that the Guidelines do not define "occupant load," and do not indicate that the UBC is an authoritative source for defining that term. In addition, relying on *Centinela Hospital Assn.* v. *City of Inglewood* (1990) 225 Cal.App.3d 1586 [275 Cal.Rptr. 901] (*Centinela*), respondents appear to contend that a small commercial facility could qualify under the former version of the Class 3 exemption *even if,* under the UBC, it has an occupant load exceeding 30 persons. Although *Centinela* provides some support for respondents' position, we reject this argument because it cannot be reconciled with the plain language of former Guidelines section 15303(c).

*Centinela, supra,* involved a proposed 15-bed, 2-story, 5,400-square-foot crisis psychiatric facility. (225 Cal.App.3d at pp. 1590, 1600-1601.) After the City of Inglewood granted a use permit for the new facility, and determined that the project was exempt from CEQA pursuant to Guidelines section 15303(c), a local hospital association unsuccessfully challenged the approval insuperior court. Division Seven of the Second Appellate District affirmed the decision of the trial court, ruling as a matter of law that the proposed facility fell within the Class 3 exemption because it was "similar to both the apartments and duplexes permitted under subdivision (b) and the

---

[7]The 1994 UBC provided: "For areas without fixed seats, the occupant load . . . permitted in any building or portion thereof shall not be less than the number determined by dividing the floor area assigned to that use by the . . . occupant load factor set forth in table 10-A. Where an intended use is not listed in table 10-A, the building official shall establish an occupant load factor based on a listed use which most nearly resembles the intended use. [¶] . . . [¶] The occupant load for buildings or areas containing two or more occupancies shall be determined by adding the occupant loads of the various use areas as computed in accordance with the applicable provisions of this section." (Cal. Code Regs., tit. 24, former § 1002.1.2.) The occupant load factor is 100 for office use, and 30 for retail use. (*Id.,* at former table 10-A.)

small commercial structures permitted under subdivision (c)" of Guidelines section 15303. (*Centinela, supra,* at p. 1600.) Without any meaningful analysis, the *Centinela* court rejected the appellant's claim that the project was "designed for an occupant load" of greater than 30 persons, saying: "We find to be without merit appellant's claim that in determining whether the facility meets the requirement in subdivision (c) pertaining to the occupant load of 30 persons or less, we should apply the calculations set out in the Inglewood Municipal Code for determining the 'occupant load' for hospitals, sanitariums, nursing homes, or dormitories." (*Id.* at p. 1600.)

Apparently, respondents view this aspect of the *Centinela* decision as a holding that local agencies are free to disregard the occupant load limit stated in Guidelines section 15303(c) and the technical meaning of that term as it is used in the UBC (Cal. Code Regs., tit. 24, pt. 2),[8] in the various locally adopted versions of the UBC (see Health & Saf. Code, §§ 17958, 17958.5, 17958.7, 18941.5; *ABS Institute* v. *City of Lancaster* (1994) 24 Cal.App.4th 285, 289 [29 Cal.Rptr.2d 224] [all California cities and counties are required to adopt the UBC, as modified by the Department of Housing and Community Development, as their local building codes]), and in numerous other California regulations (see, e.g., Cal. Code Regs., tit. 8, §§ 3207, 3216, 3223, 3226, 3228, 3229, 3231, 3235; *id.,* tit. 14, §§ 757, 15301; *id.,* tit. 19, § 3.30; *id.,* tit. 24, § 1003.2.2 et seq.; *id.,* tit. 25, §§ 1640, 1738, 6962).

This is not an entirely unreasonable reading of the holding in *Centinela.* After all, the 5,400-square-foot building in that case would have had an occupant load of 108 if it was computed using the occupant load factor of 50 for dormitories, or an occupant load of 67.5 if it was computed using the occupant load factor of 80 for a hospital. (See Cal. Code Regs., tit. 24, former § 1002.1.2 & table 10-A.) In either case, the psychiatric facility approved in *Centinela* could not have been found to fall within the occupant load limit established by former Guidelines section 15303(c). Presumably, the *Centinela* court viewed the occupant load limit as a flexible standard, or one that could be overlooked so long as the proposed commercial building(s) were similar to the specific types of "small commercial structures" listed in former Guidelines section 15303(c).[9]

■ We do not share the *Centinela* court's view of the former Class 3 exemption. It seems quite obvious to us that the phrase "if designed for an

---

[8]The UBC is part of the California Building Standards Code, as defined in the California Building Standards Law. (See Health & Saf. Code, §§ 18901 et seq., 18935 et seq.)

[9]The *Centinela* court did not discuss the six dwelling unit limit on the Class 3 exemption for apartments, duplexes, and similar structures. (Former Guidelines, § 15303(b).) The current version of Guidelines section 15303(b) retains this limit, but the term "apartments" was deleted by the 1998 amendments to that provision.

occupant load of 30 persons or less," was used in former Guidelines section 15303(c), and is currently used in other California regulations (see, e.g., Guidelines, § 15301(*l*)(3); Cal. Code Regs., tit. 14, § 757), as an objective standard for classifying a structure by its size and—perhaps more importantly for purposes of CEQA review—by the likely density or intensity of its use. It is also quite apparent that the phrase "occupant load" is a reference to a term of art in the architectural and engineering professions, and one that is defined in the UBC.[10] Applying the UBC definition, moreover, it is clear that the revised project proposed by real parties in interest exceeds the occupant load limit established by former Guidelines section 15303(c). In any event, the city planning director's comment that he "could not imagine 30 or more people in the building at any one time" is not substantial evidence to support a finding that the project was designed for an occupant load of 30 persons or less. (See § 21082.2, subd. (c) [substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts," but does not include "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous"].)

In former Guidelines section 15303(c), in particular, the occupant load limit was used to determine what it means to be a "small" commercial structure, the construction or renovation or demolition of which is unlikely to have any significant impact upon the environment. Plainly, the list of small commercial structures in former Guidelines section 15303(c) was not intended to be exhaustive. However, and contrary to the holding in *Centinela, supra,* 225 Cal.App.3d at page 1600, a fair reading of the provision strongly suggests that while commercial occupancies other than "stores, motels, offices, restaurants" may have been found to be covered by former Guidelines section 15303(c), any proposed commercial building was nevertheless required to meet the UBC occupant load standard in order to enjoy a Class 3 exemption from the requirements of CEQA.

If that were the end of our inquiry, we would almost certainly have to reverse the trial court's decision on the Guidelines section 15303(c) exemption. It is, as we have noted, undisputed that the UBC occupant load of the retail/office building proposed by real parties in interest is 122, which is 4 times greater than the former Guidelines section 15303(c) occupant load limit. ■ However, since the administrative and trial court proceedings were completed, that provision was amended to incorporate a new and

---

[10]As we have noted, the trial court declined to entertain the Farnsworth and Rivasplata declarations, which support this conclusion, apparently because this evidence was not before the administrative agency. We need not decide whether this was error because essentially the same information was brought to the attention of the city council by Planning Commissioner Nancy Stoltz, who is a licensed architect.

different, but nonetheless objective, standard for determining what now qualifies as a *small* "store, motel, office, restaurant or similar structure," in an "urbanized" area. (*Ibid.*) Most significantly, the 1998 amendments eliminated the occupant load measure in favor of one that focuses solely on the "floor area" of the structure, without regard to the proposed density or intensity of use. Thus, under Guidelines section 15303(c), as amended in 1998, the Class 3 exemption applies to "[a] store, motel, office, restaurant or similar structure . . . not exceeding 2500 square feet in floor area" and "[*i*]*n urbanized areas . . . up to four such commercial buildings not exceeding 10,000 square feet in floor area* on sites zoned for such use." (Italics added.)[11] As the California Resources Agency has explained: "[Section 15303] describes the class of small projects involving new construction or conversion of existing small structures. The 1998 revisions to the section clarify the types of projects to which it applies. In order to simplify and standardize application of this section to commercial structures, the reference to 'occupant load of 30 persons or less' contained in the prior guideline was replaced by a limit on square footage. Subsection (c) further limits the use of this exemption to those commercial projects which have available all necessary public services and facilities, and which are not located in an environmentally sensitive area." (Cal. Resources Agency, Cal. Environmental Resources Evaluation System, CEQA Guidelines, art. 19, p. 6 <http://ceres.ca.gov/topic/env_law/ceqa/guidelines/art19.html> [visited Aug. 24, 1999].)

 Fairbank does not contend that the recent amendments to Guidelines section 15303(c) cannot be applied retroactively to the project in this case, the application for which was submitted in July 1997, revised in January 1998, and approved by the city council in April 1998.[12] However,

---

[11]The parties disagree on the meaning of the 1998 amendments to Guidelines section 15303(c), but do not dispute that the project in this case will be located in an "urbanized" area. There is, moreover, no suggestion that the project will involve "use of significant amounts of hazardous substances," or that it lacks any "necessary public services and facilities," or that the area is "environmentally sensitive." (*Ibid.*)

[12]Citing Guidelines section 15007(b), Fairbank argues for the first time in her petition for rehearing that the 1998 version of Guidelines section 15303(c) cannot be applied retroactively to the project under review. She also claims she has been denied an opportunity to brief the issue of retroactive application of the new Guidelines section 15303(c), in violation of Government Code section 68081. We reject these arguments. Fairbank herself first raised the issue of the applicability of the amendment to Guidelines section 15303(c) in the trial court before the new Guidelines were adopted, arguing that it would not provide an exemption because it applies only to "new structures 'not exceeding 2500 square feet in floor area.' " She raised the issue again in her opening brief on appeal, contending that the revised section exempts structures similar to those exempted by former Guidelines section 15303(c), and that "the proposed project would also fail to qualify for exemption pursuant to the revised language of [section] 15303(c)." In her reply brief, in response to respondent's argument that the "current exemption allows commercial buildings of up to 10,000 square feet in floor area

she does appear to contend that the 1998 amendments were not intended to expand the Class 3 exemption to include commercial structures that are

regardless of occupancy load," Fairbank elaborated her argument that the project could not be found exempt under either the former or current version of Guidelines section 15303(c). Finally, in response to a question from the panel at oral argument, Fairbank's counsel took the position that she did not know whether it would be proper to apply the 1998 version of section 15303(c) to the project in this case, but that it would not provide an exemption in any event. Fairbank, thus, had ample opportunity to brief and argue the issue of retroactive application of the 1998 amendment to Guidelines section 15303(c), and "chose [her] own strategy in that regard." (*Garcia* v. *Hejmadi* (1997) 58 Cal.App.4th 674, 692, fn. * [68 Cal.Rptr.2d 228].) There was, thus, no violation of Government Code section 68081. (58 Cal.App.4th at p. 692.) On the contrary, Fairbank has waived any argument against retroactive application of the new guideline by failing to raise that objection, without any showing of good cause for the delay, until she filed her petition for rehearing. (See *Hunt* v. *County of Shasta* (1990) 225 Cal.App.3d 432, 446, fn. 12 [275 Cal.Rptr. 113]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 851, pp. 886-887.)

Fairbank also failed to cite any of the case law dealing with retroactivity of Guideline amendments in her petition for rehearing, doing so only upon filing a reply to respondent's answer to the petition. The rule established by those cases is that amended Guidelines should not be retroactively applied to an agency's compliance with CEQA unless the new provision specifically provides otherwise. (See, e.g., *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112, 1126, fn. 10 [26 Cal.Rptr.2d 231, 864 P.2d 502] [dictum that agency was not required to recirculate EIR (enviromental impact report), as may have been required under *draft* amendments to Guidelines]; *National Parks & Conservation Assn.* v. *County of Riverside* (1999) 71 Cal.App.4th 1341, 1347 [84 Cal.Rptr.2d 563] [compliance with new standards for significance of environmental impacts was not required where amended Guidelines establishing those standards were not in effect at time of trial court proceedings]; *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 282 & fn. 3 [152 Cal.Rptr. 585] [an EIR certified before an amendment takes effect need not conform to any new content requirements].) The underlying rationale for this "rule of reason" is that "[f]airness and the need for finality" require that the propriety of agency action be determined under the regulations in effect on the date on which the document is presented for public review. (*Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 261, fn. 12 [232 Cal.Rptr. 772] (*Long Beach*).)

Even if Fairbank had not waived her argument against retroactivity, we would be disinclined to grant her petition for rehearing. Although our Supreme Court has admonished us to afford "great weight" to the CEQA Guidelines (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278]), it has not declared them to be binding on the courts. (*Ibid.*) As the court in *Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789 [161 Cal.Rptr. 260] explained: "The regulations adopted to implement [CEQA] are designed as 'guidelines' [citation]. This term was obviously very carefully selected. They are indications or outlines to be followed, allowing for flexibility of action and conduct of governmental agencies . . . ." (*Id.* at pp. 804-805.) Moreover, even if as a general matter amendments to the CEQA Guidelines should apply "prospectively only" (Guidelines, § 15007(b)), "[f]airness and the need for finality" (*Long Beach, supra,* 188 Cal.App. at p. 261, fn. 21) militate in favor of retroactive application of the 1998 version of Guidelines section 15303(c) in the circumstances of this case. Indeed, it would make little or no practical sense for this court to hold that the exemption found in the current version of Guidelines section 15303(c) does not apply to the project as approved in this case. Were we to construe section 15007(b) to require us to so hold, we would reverse the judgment of the trial court and remand for further proceedings before the administrative

physically larger or likely to be more intensively used than the ones contemplated by the former occupant load standard. A few simple calculations demonstrate the fallacy of such an argument. If a 2,500-square-foot building were proposed for office use, it would have a UBC occupant load of 25 persons, and would clearly meet the size requirements of both the former and current versions of Guidelines section 15303(c). However, if a 2,500-square-foot building were proposed for retail use, it would have a UBC occupant load of approximately 83 persons. If a 2,500-square-foot building were proposed for restaurant use (with an occupant load factor of 15), it would have a UBC occupant load of approximately 167 persons. If a 2,500-square-foot building were proposed for mixed retail/office use in the same proportions as the current project, it would have a UBC occupant load of approximately 52 persons. For a commercial project with up to 10,000 square feet of floor area in an urbanized area, moreover, the occupant load for each of the foregoing uses would be 4 times larger than those listed for a 2,500-square-foot building: i.e., 100 for an office building, 333 for a ground-level retail store, and 667 for a restaurant. Apparently, the Secretary of the Resources Agency has extended the exemption to some structures that would not have been covered by former Guidelines section 15303(c).[13]

---

agency. At that time, real parties in interest could simply resubmit their project application, and Guidelines section 15303(c)—as amended in 1998—would govern any additional "steps in the CEQA process not yet undertaken when agencies must comply with the amendments." (Guidelines, § 15007(b).) As the city has already clearly staked out the position that the 1998 version of Guidelines section 15303(c) provides an exemption for the project, it would again approve the project and the case would soon be back before this court in essentially the same posture. Nothing would be accomplished except to delay the inevitable, at great cost to all parties.

Our conclusion on this point is consistent with settled law in the land use context, which provides that, at least where no vested rights will be impaired, it is appropriate for an appellate court to apply the law in existence at the time of its decision rather than at the time an approval was issued. (See *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 125 [109 Cal.Rptr. 799, 514 P.2d 111]; *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 34, 39, 45 [56 Cal.Rptr. 672, 423 P.2d 824]; but cf. *Lewis* v. *Seventeenth Dist. Agricultural Assn.* (1985) 165 Cal.App.3d 823, 828-831 & fn. 6 [211 Cal.Rptr. 884] [dictum that it was "inappropriate" for court to consider a then recent amendment to the Class 23 exemption, which included language clearly encompassing the proposed racing activity].) The purpose of this rule is to prevent the appellate courts from issuing orders for the construction of improvements contrary to presently existing legislative provisions. (*Russian Hill Improvement Assn., supra,* at p. 39.) As we have discussed, the project in this case is in compliance with "presently existing legislative requirements" (*ibid.*), including those governing environmental review of new construction.

[13]At the same time, the secretary must be deemed to have found that some formerly exempt structures will no longer qualify for the Class 3 exemption. For example, a 6,000-square-foot motel (with an occupant load factor of 200) (see Cal. Code Regs., tit. 24, former § 1002.1.2 & table 10-A), constructed as a single building in a nonurbanized area, would have satisfied the occupant load requirement of former Guidelines section 15303(c). However, it would not pass muster under the new maximum floor area standard adopted in 1998 for nonurbanized areas. On the other hand, under our interpretation of the revised Guidelines section 15303(c),

Fairbank argues, however, that the recently amended Guidelines section 15303(c) exemption cannot be applied to the construction of any *single* commercial building with more than 2,500 square feet of floor area no matter where it is located and, therefore, that the 5,855-square-foot retail/ office building proposed by real parties in interest cannot be found to fall within the Class 3 exemption. Fairbank interprets the revised provision as exempting single commercial buildings "not exceeding 2500 square feet in floor area" and, in urbanized areas, *"up to four such commercial buildings"* (italics added to first two words), but only if none is larger than 2,500 square feet in floor area. Apparently, Fairbank views the word "such" as referring to the phrase "structure . . . not exceeding 2500 square feet in floor area." Respondents, for their part, argue that the 1998 version of Guidelines section 15303(c), on its face, applies to the instant project because it involves one building of less than 10,000 square feet in floor area in an urbanized area. Respondents, thus, appear to read the word "such" as referring to the phrase "store, motel, office, restaurant or similar structure." Fairbank suggests that respondents' interpretation would allow the exemption of up to four 10,000-square-foot buildings on a given parcel, for a total floor area of 40,000 square feet. Fairbank misreads the amended provision, and misconstrues respondents' argument.

The most plausible reading of current Guidelines section 15303(c), as amended in October 1998, is that a commercial project to be built in an urbanized area may be found to be exempt if it involves the construction of one, two, three, or four commercial buildings on a parcel zoned for such use, so long as the total floor area of the building(s) does not exceed 10,000 square feet. Contrary to Fairbank's argument, it does not make sense to interpret the exemption as applicable to the construction of *four* 2,500-square-foot buildings on a given parcel, but not to *one* building of 10,000 square feet or less on the same parcel. Although we do not understand respondents to so contend, it would be equally unreasonable to read current Guidelines section 15303(c) as exempting a commercial project involving construction of *four* 10,000-square-foot buildings on a single parcel in an urbanized area.

Accordingly, and indulging the strong presumption that the new Guidelines section 15303(c) is consistent with the legislative intent behind the categorical exemptions (see *Thornton* v. *Carlson* (1992) 4 Cal.App.4th 1249, 1257 [6 Cal.Rptr.2d 375]), we conclude the Secretary of the Resources Agency has found that—in general, and without some showing of unusual circumstances—construction of up to four commercial buildings with a

it would be covered by the exemption—absent unusual circumstances—if proposed for an urbanized area.

total floor area of 10,000 square feet or less will not have a significant effect on the environment in an urbanized area. (§ 21084.) Because the 5,855-square-foot retail/office building proposed by real parties qualifies under this interpretation, we further conclude it is categorically exempt under Guidelines section 15303(c), as amended in 1998.

**B.** *Fairbank Has Not Produced Substantial Evidence to Support a Finding of Unusual Circumstances Creating a Reasonable Possibility of Significant Environmental Impacts Under Guidelines Section 15300.2(c).*

■ Fairbank next contends that the project in this case cannot be found to be exempt under Guidelines section 15303(c) because it falls within an exception to that categorical exemption found in Guidelines section 15300.2(c). We disagree.

■ "In categorical exemption cases, where the agency establishes that the project is within an exempt class, the burden shifts to the party challenging the exemption to show that the project is not exempt because it falls within one of the exceptions listed in Guidelines section 15300.2. The most commonly raised exception is subdivision (c) of section 15300.2, which provides that an activity which would otherwise be categorically exempt is not exempt if there are 'unusual circumstances' which create a 'reasonable possibility' that the activity will have a significant effect on the environment. A challenger must therefore produce substantial evidence showing a reasonable possibility of adverse environmental impact sufficient to remove the project from the categorically exempt class. [Citations.]" (*Davidon Homes* v. *City of San Jose* (1997) 54 Cal.App.4th 106, 115 [62 Cal.Rptr.2d 612]; *Association for Protection etc. Values* v. *City of Ukiah* (1991) 2 Cal.App.4th 720, 728 [3 Cal.Rptr.2d 488] (*Ukiah*).)

There is a split of authority on the appropriate standard of judicial review for a local agency's decision on the applicability of the Guidelines section 15300.2(c) exception to a project that has been found to fall within a categorical exemption. Some courts have relied on cases involving review of a negative declaration, holding that a finding of categorical exemption cannot be sustained if there is a "fair argument" based on substantial evidence that the project will have significant environmental impacts, even where the agency is presented with substantial evidence to the contrary. (See e.g., *Azusa, supra,* 52 Cal.App.4th at pp. 1202-1204.) Other courts apply an ordinary substantial evidence test to questions of fact relating to the

significant effect exception, deferring to the express or implied findings of the local agency that has found a categorical exemption applicable. (See *Centinela, supra,* 225 Cal.App.3d at p. 1601; *Dehne, supra,* 115 Cal.App.3d 827.) Noting the existence of contrary authority, the court in *Ukiah,* applied the fair argument test because the parties in that case agreed upon the standard of review. (2 Cal.App.4th at pp. 729, fn. 7, 732-736.) However, the *Ukiah* court observed: "A reasonable case may be made that the 'fair argument' standard that clearly applies when reviewing a negative declaration is not the standard of review for a challenge to a decision that a project is categorically exempt. Rather, the traditional substantial evidence standard of review may be more appropriate." (*Id.* at p. 728, fn. 7.)

■■■ We need not decide which of these competing lines of authority is correct because, even under the more stringent standard of review, Fairbank has failed to raise a fair argument that "there is a reasonable possibility that the project will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2(c).) Fairbank's only claim under Guidelines section 15300.2(c) appears to be that the project does not include adequate parking facilities, and "will result in increased demand on the City's streets and other public parking areas, as well as an increase in traffic and circulation around the project site as potential site users attempt to park in the downtown area." She cites various comments from the administrative record, by which project opponents voiced concerns about the existing traffic and parking problems in downtown Mill Valley, and the prospect of the project exacerbating those problems.

The shortcoming in Fairbank's argument is that she has made no showing whatsoever of any "unusual circumstances" surrounding the construction of this small commercial structure giving rise to any risk of "significant" effects upon the environment. (Guidelines, § 15300.2(c).) While the addition of any small building to a fully developed downtown commercial area is likely to cause minor adverse changes in the amount and flow of traffic and in parking patterns in the area, such effects cannot be deemed "significant" without a showing of some feature of the project that distinguishes it from any other small, run-of-the-mill commercial building or use. Otherwise, no project that satisfies the criteria set forth in Guidelines section 15303(c) could ever be found to be exempt. There is nothing about the proposed 5,855-square-foot retail/office building that sets it apart from any other small commercial structure to be built in an urbanized area, without the use of hazardous substances and without any showing of environmental sensitivity. (See Guidelines, § 15303(c).) In short, in the absence of any evidence of unusual circumstances nullifying the grant of a categorical exemption,

there can be no basis for a claim of exception under Guidelines section 15300.2(c).

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### III. CONCLUSION

For all the foregoing reasons, the judgment of the trial court is affirmed. The parties shall bear their own costs.

Poché, Acting P. J., and Reardon, J., concurred.

A petition for a rehearing was denied October 29, 1999, and the opinion was modified to read as printed above.

---

*See footnote, *ante*, page 1243.